## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MINNESOTA

J RUBIN BUTLER, *on behalf of himself and*
*those similarly situated,*

                    Plaintiffs,

        v.

ATS INC., ATS SPECIALIZED, INC.,
COMPETITIVE EQUIPMENT LEASING,
and JOHN DOES 1-20

                Defendants.

Case No. _____

**INDIVIDUAL AND COLLECTIVE
ACTION FOR UNPAID MINIMUM
WAGES UNDER FLSA**

**CLASS ACTION UNDER TRUTH IN
LEASING ACT, FEDERAL FORCED
LABOR STATUTE, UNJUST
ENRICHMENT**

**JURY TRIAL DEMANDED**

## INDIVIDUAL, COLLECTIVE, AND CLASS ACTION CIVIL COMPLAINT

Named Plaintiff J Rubin Butler (hereinafter "Named Plaintiff"), individually and on behalf of himself and those similarly situated, by and through undersigned counsel, hereby complains as follows against Defendants ATS, Inc., ATS Specialized, Inc. (hereinafter collectively "Defendant ATS Trucking"), Competitive Equipment Leasing (hereinafter "Defendant ATS Leasing"), and John Does 1-20 (collectively, all Defendants shall be referred to as "Defendants").

## INTRODUCTION

1.      Named Plaintiff has initiated the instant action to redress Defendants' violations of the Fair Labor Standards Act ("FLSA"). Named Plaintiff asserts that Defendants erroneously designated him and all other drivers in Defendants' Lease Purchase Program as "independent contractors" and unlawfully deducted from and withheld portions of the wages owed to Named Plaintiff and those similarly situated. Specifically, Defendants required Named Plaintiff and those

1

similarly situated to cover the costs of Defendants' business, reducing the wages of Named Plaintiff and those similarly situated below the minimum wage.

2.    Named Plaintiff has initiated the instant action to redress Defendants' violations of the Truth in Leasing Act, 49 U.S.C. §14704 ("TILA").  Named Plaintiff asserts that Defendants entered into leases with Named Plaintiff and those similarly situated that violated the provisions of the TILA.

3.    Named Plaintiff has initiated this action to redress Defendants' violations of the Federal Forced Labor statute, 29 U.S.C. § 1589 ("FFL").  Named Plaintiff asserts that Defendants perpetuated a scheme to force truck drivers to labor for Defendants for long periods of time under threat of serious financial harm.

4.    Named Plaintiff has initiated this action to redress Defendants' violations of the common law for unjust enrichment on behalf of himself and all those similarly situated.

## JURISDICTION AND VENUE

5.    The foregoing paragraphs are incorporated herein as if set forth in their entirety.

6.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States, the FLSA, 29 U.S.C. § 201 *et seq.,* the TILA, 49 U.S.C. §14704, *et seq.*, and the FFL, 18 U.S.C. § 1589.  This Court has supplemental jurisdiction over Named Plaintiff's state law claims because those claims arise out of the same nucleus of operative fact as the federal claims.

7.    This Court also has jurisdiction over Named Plaintiff's state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million and at least one member of the putative class is domiciled in a state different from the domicile of any Defendant.

8.      This Court may properly maintain personal jurisdiction over Defendants, because Defendants' contacts with this state and this jurisdictional district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, and because Defendants have consented to jurisdiction in this court via a Choice of Law and Venue clause contained within the lease agreements between Plaintiffs and Defendant ATS, to which all Defendants are parties.

9.      Venue is properly laid in this judicial district pursuant to 29 U.S.C. § § 1391(b)(1) and (b)(2), because Defendants reside in and/or conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES

10.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

11.     Named Plaintiff J Rubin Butler is an adult individual residing at 1229 Spinnaker Drive, Lakeland, FL 33805. Pursuant to 29 U.S.C. § 216(b), Plaintiff Butler has consented in writing to participate in this action. His consent form is attached hereto as Exhibit A.

12.     Defendant ATS, Inc. is a truckload carrier operating throughout the United States and Canada. Defendant ATS, Inc. carries out its business via a number of wholly owned truckload carrier subsidiaries, including ATS Specialized, Inc., New Energy Transport, Inc., Warren Transport, Inc., Midwest Specialized Transportation, Inc., Waylon Transport, Inc. d/b/a ATS Canada, Sunbelt Furniture Xpress, Inc., and Q-Line Trucking Ltd.

13.     Defendant ATS Specialized, Inc. is a truckload carrier operating throughout the United States and Canada. Defendant ATS Specialized, Inc. is a wholly owned subsidiary of Defendant ATS, Inc.

14.     Defendant ATS Trucking is headquartered in and maintains a terminal in Minnesota, throughout which Defendant ATS Trucking delivers freight on a regular basis.

15.     Defendant ATS Trucking's primary business is to provide transportation of cargo for hire.

16.     Defendant ATS Leasing is a Minnesota Corporation with its principal place of business as indicated in the caption.  Defendant ATS Leasing is a wholly owned subsidiary of Defendant ATS, Inc.

17.     Defendant ATS Leasing provided equipment financing for Defendant ATS Trucking and its commercial truck drivers during the relevant time period.

18.     Defendant ATS Leasing received the benefit of illegal agreements between Defendant ATS Leasing and Named Plaintiff and those similarly situated by conspiring with Defendant ATS Trucking to deny Named Plaintiff and those similarly situated the benefits afforded to them under federal law.

19.     Defendants engaged in a scheme whereby Defendant ATS Leasing leased tractor trailers to Named Plaintiff, Class Plaintiffs and Collective Plaintiffs (herein collectively "Plaintiffs"), whom Defendant ATS in turn required through their contracts with Plaintiffs to sublease said tractor trailers along with their driving services to Defendant ATS Trucking, permitting Defendants to misclassify Plaintiffs as independent contractors, deprive Plaintiffs of their rights under federal and state law, and pass their business expenses on to Plaintiffs.

20.     Defendants received the benefit of agreements, illegal under the Federal Forced Labor Statute, for Defendant ATS Leasing to lease trucks to Plaintiffs which were to be used in driving for Defendant ATS Trucking and were subject to the provisions, restrictions, and penalties of "Equipment Lease with Option to Purchase" ("Lease Agreements") between Defendant ATS

Leasing (and/or its successors in interest) and Plaintiffs, and the provisions, restrictions, and penalties of Independent Contractor Operating Agreements ("ICOAs") between Plaintiffs and Defendant ATS Trucking.

21.    By virtue of their common ownership, the coordination required to execute their scheme and the extensive restrictions placed on Plaintiffs' work by the Lease Agreements and ICOAs, Defendant ATS retained such control over Plaintiffs that the individual entities functioned as Plaintiffs' joint employers.

22.    Defendants John Doe 1 through John Doe 20 are presently unknown persons who directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices of Defendants, which resulted in Defendants failing to pay Named Plaintiff and Collective Plaintiffs proper compensation pursuant to the FLSA.

23.    Defendants John Doe 21 through John Doe 40 are presently unknown persons who had control over processing payroll regarding Plaintiffs.

24.    At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

25.    The foregoing paragraphs are incorporated herein as if set forth in their entirety.

26.    Named Plaintiff brings this action for violations of the FLSA as an individual action and as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of all persons who performed work as lease operators and who were designated as "independent contractors" by Defendants at any point during the three years preceding the date the instant action

was initiated (the members of this putative class are herein collectively referred to as "Collective Plaintiffs").

27.    Named Plaintiff and Collective Plaintiffs are similarly situated, have substantially similar job duties, have substantially similar pay provisions, and are all subject to Defendants' unlawful policies and practices as described herein.

28.    There are numerous similarly situated current and former employees of Defendants who were compensated in violation of the FLSA and who would benefit from the issuance of a Court Supervised Notice of the instant lawsuit and the opportunity to join the present lawsuit.

29.    Similarly situated employees are known to Defendants, are readily identifiable by Defendants, and can be located through Defendants' records.

30.    Therefore, Named Plaintiff should be permitted to bring this action as a collective action for and on behalf of himself and those employees similarly situated, pursuant to the "opt-in" provisions of the FLSA, 29 U.S.C. § 216(b).

## CLASS ACTION ALLEGATIONS

31.    The foregoing paragraphs are incorporated herein as if set forth in their entirety.

32.    Named Plaintiff brings this action for violations of the TILA, the FFL, and the common law as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who performed work as lease operators or in similar positions who were designated as "independent contractors" by Defendants and who worked in this capacity at any point during the applicable statute of limitations (the members of this putative class are herein collectively referred to as "Class Plaintiffs").

33.    The class is so numerous that the joinder of all class members is impracticable. Named Plaintiff does not know the exact size of the class, as such information is in the exclusive

control of Defendants; however, on information and belief, the number of potential class members is in the hundreds.

34.     Named Plaintiff's TILA claims are typical of the claims of Class Plaintiffs because Named Plaintiff and all Class Plaintiffs signed substantively similar lease agreements which contained terms and conditions which are unlawful pursuant to the TILA.

35.     Named Plaintiff's FFL claims are typical of Class Plaintiffs because Named Plaintiff and all Class Plaintiffs were subject to similar financial penalties if they attempted to cease working for Defendants.

36.     Named Plaintiff's common law claims for unjust enrichment are typical of the claims of Class Plaintiffs because Defendant ATS uniformly utilized illegal liquidated damages provisions to enrich itself and to obtain labor from Named Plaintiff and Class Plaintiffs at sub-minimum wage levels.

37.     Named Plaintiff will fairly and adequately protect the interests of the Class Plaintiffs, because Named Plaintiff's interests are coincident with and not antagonistic to those of the class.  Named Plaintiff has retained counsel with substantial experience in the prosecution of claims involving employee wage disputes.

38.     No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action.  The class will be easily identifiable from Defendants' records.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Such treatment will allow all similarly situated individuals to prosecute their common claims in a single forum simultaneously.  Prosecution of separate actions by individual members of the putative class would create the risk of inconsistent or varying

adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants.  Furthermore, the amount at stake for individual putative class members may not be great enough to enable all of the individual putative class members to maintain separate actions against Defendants.

40.     Questions of law and fact that are common to the members of the class predominate over questions that affect only individual members of the class.  Among the questions of law and fact that are common to the class are: (1) whether Defendants coerced Named Plaintiff and Class Plaintiffs to perform work for Defendants through coercive means whereby Named Plaintiff and Class Plaintiffs were subject to serious financial harm if they attempted to cease working; (2) whether Defendants violated TILA with respect to the agreements signed by Named Plaintiff and Class Plaintiffs; and (3) whether Defendants were unjustly enriched by their relationships with Named Plaintiff and Class Plaintiffs.

## STATUTORY AND REGULATORY FRAMEWORK

41.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

42.     The federal Truth-in-Leasing regulations, 49 C.F.R. Part 376, were developed by the Interstate Commerce Commission out of grave concern for the plight faced by Lease Drivers and Owner Operators within the trucking industry.  The regulations govern the leases between motor carriers and independent owner-operators of trucks and were enacted to create transparency in the terms of the equipment and driver services leases to help combat illegal practices by motor carriers such as skimming from owner-operator compensation.  In furtherance of this goal, and with the express intent of alleviating the burden placed on owner-operators by the significant disparity in bargaining power that largely defines their relationship with motor carriers, the Truth-

in-Leasing regulations provide standards of conduct to be incorporated in written leases that govern the contractual relationship between the owner-operator and motor carrier.

43.    To protect owner-operators from abusive business practices by motor carriers, the Truth-in-Leasing regulations proscribe certain terms and conditions that govern these relationships:

a.    "[A]uthorized motor carriers" such as Defendants may perform authorized transportation in equipment that they do not own *only* if the equipment is covered by a written lease meeting the requirements set forth in 49 C.F.R. § 376.12.  *See* 49 C.F.R. § 376.11(a).

b.    The conduct and business practices of authorized motor carriers must comply with the Truth-in-Leasing regulations irrespective of whether their written lease agreements satisfy the requirements of the regulations. 49 C.F.R. § 376.12.

c.    When a driver leases his or her equipment to an authorized motor carrier, the compensation for the equipment and services must be "clearly stated on the face of the lease or in an addendum which is attached to the lease." 49 C.F.R. § 376.12(d).

d.    An owner-operator driver may not be required to purchase any products, equipment or services from the authorized carrier as a condition of entering into the lease.  49 C.F.R. §376.12(i).

e.    An authorized carrier may make deductions from a driver's compensation for items initially paid for by the carrier *only* if those items are clearly specified in the lease and then *only* if the lease recites how the amount of each deduction is

computed.  49 C.F.R. §376.12(h).

f.   The lease must inform the driver that he or she is entitled to copies of those documents which are necessary to determine the validity of the charge.  49 C.F.R. §376.12(h).

g.   Where an owner-operator driver is required to deposit funds with the carrier to cover certain specified costs, such "escrow funds" are monies which belong to the owner-operator drivers.  49 C.F.R. §§376.12(k)(2), (6).

h.   Where escrows are required, the lease must clearly specify how the money can be used and the money can only be used for actual obligations incurred by an individual driver.  49 C.F.R. §§376.12(k)(2), (6).

i.   The carrier must provide periodic accountings to drivers, and, upon termination of the relationship with the carrier, a final accounting reporting all transactions involving the escrow fund. 49 C.F.R. §376.12(k)(3), (4), (6).

j.   The carrier must pay interest to the driver on amounts deposited in escrow on at least a quarterly basis.  49 C.F.R. 376.12(k)(5).

k.   Following termination, all unused escrow funds must be returned to the driver within 45 days from the date of termination.  49 C.F.R. §376.12(k)(6).

l.   By statute, each motor carrier providing transportation of household goods is responsible for all acts or omissions of its agents which relate to the performance of such transportation.  49 U.S.C. § 13907.

m.  An authorized carrier is obligated "to ensure that [owner-operator drivers] receive all of the rights and benefits … under the leasing regulations…" regardless of whether the lease is between the authorized carrier and the driver

or between the authorized carrier and its agent.  49 C.F.R. § 376.12(m).

44.     49 U.S.C. § 14704(a)(1) and (2) authorizes owner-operator drivers to bring legal actions for injunctive relief and damages to enforce the federal Truth-in-Leasing regulations.  49 U.S.C. § 14704(e) authorizes an award of attorney's fees to owner-operator drivers in such cases.

**FACTUAL BACKGROUND**

45.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

46.     Named Plaintiff worked for Defendants as a commercial truck driver from in or around August 2017 to in or around December 2018.

47.     During his employment with Defendants, Named Plaintiff transported household goods, furniture, fixtures and belongings, in addition to other things, on set routes throughout Minnesota and at least thirty-eight (38) others states, including, California, Florida, Texas, Maine and Washington.

48.     Collective and Class Plaintiffs worked/work for Defendants as commercial truck drivers during the relevant time periods.

49.     Upon Named Plaintiff's hiring, Defendants required Named Plaintiff to attend an orientation, which lasted approximately five days.

50.     Upon Collective and Class Plaintiffs' hiring, Defendants required them to attend an orientation, which lasted approximately five days.

51.     At all times relevant, Defendants unlawfully designated Named Plaintiff, Collective Plaintiffs, and Class Plaintiffs as independent contractors.

## Named Plaintiff, Collective Plaintiffs, and Class Plaintiffs
## Were "Employees" under Federal and State Law

52.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

53.     Upon Named Plaintiff's hiring, Defendants required Named Plaintiff to attend an orientation, which lasted approximately five days.

54.     During orientation, Defendants required Named Plaintiff to learn the policies, practices, and procedures of Defendants, watch numerous training videos, take a drug test, undergo a medical physical, and take a road test.

55.     Upon Collective and Class Plaintiffs' hiring, Defendants required Collective and Class Plaintiffs to attend orientation, which lasted approximately five days.

56.     During orientation, Defendants required Collective and Class Plaintiffs to learn the policies, practices, and procedures of Defendants, watch numerous training videos, take a drug test, undergo a medical physical, and take a road test.

57.     During Orientation, Defendants provided to Named Plaintiff an "Independent Contractor Operating Agreement" ("ICOA") which purported to classify Named Plaintiff as an independent contractor for the remainder of his employment with Defendants.

58.     Defendants required Named Plaintiff to sign the ICOA as a condition of working for Defendants.

59.     During Orientation, Defendants provided to Collective and Class Plaintiffs ICOAs which purport/purported to classify Collective and Class Plaintiffs as independent contractors for the remainder of their employment with Defendants.

60.     Defendants required Collective and Class Plaintiffs to sign the ICOAs as a condition of working for Defendants.

61.     The ICOAs provided to Plaintiffs are similar and/or identical in all material terms.

62.     The ICOAs between Plaintiffs and Defendant ATS Trucking purport to classify Plaintiffs as independent contractors.  2018 ICOA, *attached hereto as* Exhibit A at p. 1 ⁋ 2.

63.     Per the ICOAs, Plaintiffs are/were responsible for paying "all operating expenses, including all expenses of fuel, oil, maintenance, and repairs to the Equipment, road taxes, mileage taxes, vehicle insurance, fuel taxes, fines for parking, moving or weight violations, personal expenses while on the road or any other levies or assessments" related to their work for Defendants. 2018 ICOA, Ex. A at p. 1 ⁋ 5.

64.     Defendant ATS Trucking provided the ICOAs to Plaintiffs under the guise that Plaintiffs would be participating in Defendants' Lease-Purchase Program.

65.     As a condition of participating in Defendant ATS Trucking's Lease-Purchase Program, Defendant ATS Trucking also required Plaintiffs to enter into "Equipment Lease with Option to Purchase" Agreements ("Lease Agreements") with Defendant ATS Leasing whereby Plaintiffs leased commercial tractors from Defendant ATS Leasing.

66.     Per his Lease Agreement, Defendants required Named Plaintiff to pay several hundred dollars per week just to use Defendants' trucks and work for Defendants.

67.     Collective and Class Plaintiffs' Lease Agreements require/required them to pay a weekly truck lease fee in order to use Defendants' trucks.

68.     During the leasing period, Plaintiffs' trucks remained the property of Defendants.

69.     Defendants controlled and directed Plaintiffs in the performance of their work.

70.     As over-the-road drivers for Defendants, Plaintiffs' work was transitory in nature.

71.     Defendant ATS assigned each Plaintiff a "driver manager," who acted as Plaintiffs' supervisors throughout their employment with Defendants.

72.     Following Defendants' orientation, Plaintiffs report/reported their status to Defendants via the Qualcomm computer in the truck.

73.     Plaintiffs are/were not permitted to use the commercial vehicles leased to them for any carrier other than Defendants.

74.     Plaintiffs are/were not permitted to use the leased vehicles to haul loads other than those provided by Defendants.

75.     Plaintiffs are/were not permitted to use the leased vehicles for any purpose other than to further the business interests of Defendants.

76.     As a condition of leasing their vehicles from Defendants, Named Plaintiff was required to agree that he "shall use this Equipment under an Independent Contractor Operating Agreement ("ICOA") with **ATS, INC.** ("Carrier") only," except when certain specific conditions were met.  Lease Agreement, Ex. B at p. 4, ⁋ 9 (emphasis in original).

77.     As a condition of leasing their vehicles from Defendants, Plaintiffs were required to agree that Plaintiffs "shall use this Equipment under an Independent Contractor Operating Agreement ("ICOA") with [**Defendant ATS Trucking**] ("Carrier") only," except when certain specific conditions were met.  *Id.*

78.     In order for Plaintiffs to accept work from a carrier other than Defendant ATS Trucking, Defendant ATS Leasing required Plaintiffs to first purchase the leased vehicle or meet all of the following conditions:

   a.  That Plaintiffs not owe Defendant ATS Leasing any monies or that Plaintiffs arrange to satisfy any debt to Defendant ATS Leasing to ATS Leasing's satisfaction;
   b.  That the motor carrier to which Plaintiffs wish to lease the vehicle have a "Satisfactory" safety rating from the Federal Motor Carrier Safety Administration and an operating ratio for the preceding year no higher than 95%;

     c.   That the motor carrier agrees to deduct Plaintiffs' lease payments, charge-backs and any other monies owed to Defendant ATS Leasing from Plaintiffs' compensation or escrow accounts then remit said monies to Defendant ATS Leasing on a weekly basis;

     d.   To distribute all gross compensation earned by Plaintiffs in connection with the use of the equipment in the manner prescribed by Defendant ATS Leasing in the Lease Agreement;

     e.   That Plaintiffs and the sublease carrier execute an "Authorization and Assignment" form, under which Plaintiffs agree to assign their wages to Defendant ATS Leasing and permit the sublease carrier to forward all or portions of said wages to Defendant ATS Leasing in order to pay Plaintiffs' debts;

     f.   Supply Defendant ATS Leasing with a draft of Plaintiffs' planned ICOA with the sublease carrier at least thirty (30) days before Plaintiffs sign the ICOA; and

     g.   Give Defendant ATS Leasing thirty (30) days written notice of Plaintiffs' intention to change carriers.

79.    Plaintiffs were further restricted from accepting work from any carrier other than Defendant ATS Trucking unless "written consent is given by [Defendant ATS Trucking]". 2018 ICOA, Ex. A at p. 1 ¶ 2(B).

80.    During orientation, Defendant ATS instructed Plaintiffs that their employment and lease agreements would be terminated if they accepted work from any carrier other than Defendant ATS.

81.    Per their agreement with Plaintiffs, Defendant ATS is "not obligated to provide [Plaintiffs] a minimum volume of freight.". 2018 ICOA, Ex. A at p. 1 ¶ 2(A).

82.    Throughout their employment, Plaintiffs were not permitted to choose which loads were offered to them.

83.    Plaintiffs had no meaningful opportunity to increase their revenue by recruiting new customers, as they are/were not permitted to recruit new customers as a consequence of being permitted to accept only loads assigned to them by Defendants.

84.     Named Plaintiff was paid a percentage of "Transportation Revenue", which was not subject to negotiation based on the individual loads assigned to Named Plaintiff.

85.     Plaintiffs were paid a percentage of gross freight revenue and/or a flat per-mile rate, which was not subject to negotiation based on the individual loads assigned to Plaintiffs.

86.     Plaintiffs can/could do little to increase their profitability other than attempt to work more hours and increase fuel efficiency.

87.     Plaintiff are/were not able to negotiate the rates that were paid to them on loads that were assigned to them by Defendants.

88.     Plaintiffs were economically dependent on Defendants.

89.     Plaintiffs would default on the Lease Agreements if any of the following events occurred:

      a.   "Failure of [Plaintiffs] to make Lease Payments within ten (10) days after it is due or, upon demand, any other amount required to be paid herein or under any other agreement with Lessor"; *Id.* at p. 6 ¶ 13(a)

      b.   "Failure of [Plaintiffs] to timely perform any covenant, condition or obligation other than remittance of the Lease Payments, required by [Defendant ATS Leasing] under this Lease (and such failure shall continue for ten (10) days after written notice by Lessor) or under any material contract, loan or lease agreement" including Plaintiffs' ICOAs with Defendant ATS Trucking or Plaintiffs' obligation under the Lease Agreements to maintain an ICOA with Defendant ATS Trucking; *Id.* at p. 6 ¶ 13(b)

      c.   "Failure by [Plaintiffs] to generally pay its debts as such debts become due, and [Plaintiffs] continue[] generally not paying [Plaintiffs'] debts as such debts become due for a period of ten (10) days after written notice given by [Defendant ATS Leasing]"; *Id.* at p. 6 ¶ 13(c)

90.     Upon occurrence of any event of default, Defendant ATS Leasing retained the right to:

a.  "Cause [Plaintiffs], upon written demand of [Defendant ATS Leasing] and at [Plaintiffs'] risk and expense, to promptly return any and all Equipment to [Defendant ATS Leasing]"; Lease Agreement at p. 6 ⁋ 14(a)

b.  "[t]ake possession of any or all Equipment and remove same without liability for injuries suffered through or loss caused by such repossession and repossession shall not constitute termination of the Lease"; *Id.* at p. 6 ⁋ 14(b)

c.  "Sell or lease all Equipment at public or private sale or lease at such time or times as [Defendant ATS Leasing] may determine"; *Id.* at p. 7 ⁋ 14(c)

d.  "cause [Plaintiffs] to pay [Defendant ATS Leasing] … an amount equal to the Lease Payments in respect of such Equipment due and payable on the first of the month following the date of the notice of default plus a sum equal to the appropriate Stipulated Loss Value"; *Id.* at p. 7 ⁋ (d).

91.    By virtue of the aforementioned contract terms Plaintiffs would default on their Lease Agreements and be subject to large penalties if they were to cease working for Defendants without written approval.

92.    At the time of his termination, Named Plaintiff's remaining Lease Payments totaled approximately $16,380 and his Stipulated Loss Value totaled approximately $135,162, purportedly exposing Named Plaintiff to at least approximately **$151,542** in liability for ending his employment with Defendants.

93.    Upon information and belief, Defendants entered into joint agreements to administer the Lease-Purchase Program that Plaintiffs participated in, including the deduction of lease and maintenance payments from Plaintiffs' settlement sheets and the division of such payments between Defendant ATS Trucking, Defendant ATS Leasing and Defendant John Does 1-20.

94.    At all times, Defendants directed, provided, and supervised the work performed by Plaintiffs on Defendants' behalf.

**Failure to Pay Minimum Wage for all Hours Worked**
**(Plaintiffs v. Defendants)**

95.    The foregoing paragraphs are incorporated herein as if set forth in full.

96.    Following the completion of Defendants' orientation, per their ICOAs, Plaintiffs agreed to "lease" a vehicle from Defendants to enable them to perform work for Defendants.

97.    The Lease Agreements required Plaintiffs to pay a weekly truck lease fee in order to use Defendants' trucks.

98.    During the leasing period, Plaintiffs' assigned trucks remained the property of Defendants.

99.    Plaintiffs were not permitted to use the leased vehicles for any purpose other than to further the business interests of Defendants.

100.    Plaintiffs were not permitted to use the leased vehicles to haul loads other than those provided by Defendants.

101.    By virtue of the Lease Agreements, Defendants designate/designated Plaintiffs as "independent contractors" and require/required Plaintiffs to pay for all expenses incurred while over-the-road, including but not limited to insurance, fuel, and maintenance costs (in addition to the cost of leasing the vehicles).

102.    Following Defendants' orientation, Plaintiffs report/reported their status to Defendants via the Qualcomm computers in their assigned trucks.

103.    Plaintiffs were required to remain on assignment continually for more than 24 hours while away from home and either on dispatch or available for dispatch for Defendants.  *See* 29 C.F.R. § 785.22.

104.    While over-the-road for Defendants, Plaintiffs were confined to the general vicinity of their assigned trucks for more than 24 consecutive hours.

105.    By way of further detail, Plaintiffs were regularly and routinely away from home and over-the-road for more than 24 consecutive hours, driving commercial vehicles for Defendants and delivering freight for Defendant's customers when they worked for Defendants.

106.    Plaintiffs regularly and routinely completed paperwork, engaged in trip-planning, performed pre-trip and post-trip inspections of the vehicle and trailer, communicated with Defendants' dispatchers, and fueled the vehicle for a combined multiple hours a day, every week they worked for Defendants, while away from home and over-the-road for more than 24 consecutive hours and either dispatched on Defendants' customers' loads or awaiting a dispatch from Defendants' dispatchers.

107.    Plaintiffs regularly and routinely were required to remain in or in close proximity to their assigned trucks while freight was loaded and unloaded at Defendants' customers' business locations, typically for at least half-an-hour per stop, and regularly for multiple hours per stop, every week they worked for Defendants.

108.    Plaintiffs regularly and routinely provided security for Defendants' customers' cargo while they were unable to drive because they had exceeded their allowable drive-time or on-duty-time under the Department of Transportation's Hours-of-Service regulations, typically for at least 10 hours per day, every week they worked for Defendants.

109.    Plaintiffs regularly and routinely provided security for Defendant ATS Leasing's truck, and/or Defendants' trailers, while they were waiting to depart from a stop, in order to align their arrival at their next stop with their Hours-of-Service drive-time and on-duty time limitations, traffic conditions, and arrival windows specified by the customer, typically for multiple hours per week, every week they worked for Defendants.

110.     Plaintiffs regularly and routinely provided security for Defendant ATS Leasing's truck and/or Defendants' trailers, while they were waiting to receive a new dispatch, typically for multiple hours per week, every week they worked for Defendants.

111.     As such, Plaintiffs were either driving, performing non-driving active duties such as fueling or performing pre-trip inspections, or providing security services to the cargo, trucks, and trailers, or were on-call waiting for direction from Defendants for 24 hours per day while away from home and either on a dispatch or waiting for a dispatch.

112.     Per 29 C.F.R. § 785.22, the maximum amount of time an employer may dock an employee who is on assignment, for more than 24 hours, for sleeping and meal periods is 8 hours per day.  The remaining amount of time (16 hours per day) is work time.

113.     Accordingly, Plaintiffs were entitled to at least 16 hours of pay at the federal minimum wage of $7.25/hour while they worked away from home for 24 consecutive hours or more and were either on a dispatch or awaiting dispatch.

114.     Alternatively, per 29 C.F.R. § 785.22, an employee who is required to be on duty for less than 24 hours is working even when permitted to sleep or engage in other personal activities when not busy.

115.     Accordingly, Plaintiffs were entitled to pay for all time spent on duty, including time spent sleeping or engaging in other personal activities, while they worked away from home for 24 consecutive hours or less and were either on dispatch or awaiting dispatch.

116.     Furthermore, Plaintiffs were regularly denied at least five hours of uninterrupted sleep each working day, and accordingly should have been paid for all time logged in the sleeper berth.  29 C.F.R. § 785.22.

117.    Defendants' pay structure and wage deduction practices and policies regularly caused Plaintiffs' wages to drop below the state and federal minimum wage for all hours worked during a workweek.

118.    For example, on August 29, 2018, Named Plaintiff was issued a pay statement for work he performed during the previous workweek.  His statement shows that he drove 2,185 miles for Defendants; nevertheless, after deductions for Defendants' business expenses, Named Plaintiff finished the workweek **in debt to Defendants** and **was paid nothing**.

119.    In the approximately eighteen months that Named Plaintiff was employed by Defendants, Named Plaintiff received *fourteen* paystubs that indicated that he was **in debt to the company** and would receive **no pay for working in those weeks**, despite having completed compensable work for Defendants in the workweeks preceding the paychecks.

120.    Named Plaintiff regularly drove and delivered freight for Defendants in weeks where he was on assignment 24-hours per day, and in which he received no net pay after Defendants deducted fees and expenses for lease payments, occupational injury insurance, vehicle collision insurance, and fuel, among other things.

121.    Accordingly, Defendants failed to pay Named Plaintiff the federal minimum wage for all compensable hours worked in such workweeks where he drove for Defendants but received no net pay after deductions.

122.    Upon information and belief, Class Plaintiffs and Collective Plaintiffs similarly regularly received less than the federal minimum wage for all hours worked during numerous workweeks.

123.    Furthermore, Defendants' pay structure and wage deduction practices and policies caused Named Plaintiff to receive wages so infrequently that, on several occasions, Named

Plaintiff did not receive any wages for more than 15 days, in violation of Minnesota law. M.S.A. § 181.10-181.101. At times, Defendants paid Named Plaintiff so infrequently that he did not receive *any* wages for more than 31 days, in violation of Minnesota law. *Id.*

124.    Upon information and belief, Defendants' pay structure and wage deduction practices and policies caused Class Plaintiffs to receive wages so infrequently that, on occasion, Class Plaintiffs did not receive *any* wages for more than 15 days, in violation of Minnesota law. *Id.* At times, Defendants paid Class Plaintiffs so infrequently that they did not receive *any* wages for more than 31 days, in violation of Minnesota law. *Id.*

125.    Additionally, as a result of Defendants' pay structure and wage deduction practices, Defendants failed to pay Named Plaintiff, a transitory employee, his earned wages within 24 hours of his termination in violation of Minnesota law. M.S.A. § 181.11, 181.13.

126.    Upon information and belief, Defendants fail(ed) to pay Plaintiffs, who are transitory employees, their earned wages within 24 hours of termination in violation of Minnesota law. *Id.*

127.    At all times, Defendants directed, provided, and supervised the work performed by Plaintiffs on Defendants' behalf.

128.    As a result of Defendants' unlawful actions Plaintiffs have been harmed.

### Defendant's Unlawful Wage Assignment and Wage Deduction Policy
### (Named Plaintiff and Collective Plaintiffs v. Defendants)

129.    The foregoing paragraphs are incorporated herein as if set forth in full.

130.    Upon information and belief, Defendants paid Plaintiffs.

131.    Upon information and belief, paychecks, which were provided to Plaintiffs, were processed in Minnesota.

132.    Per their contracts with Plaintiffs, Defendants maintained a Wage Assignment and Deduction Policy whereby Defendants required Plaintiffs to pay for Defendants' business expenses, including, but not limited to:

a.    "all operating expenses, including all expenses of fuel, oil, maintenance, and repairs to the [Leased Vehicles], road taxes, mileage taxes, vehicle insurance, fuel taxes, fines for parking, moving or weight violations, personal expenses while on the road or any other levies or assessments."; 2018 ICOA, Ex. A at p. 1, ¶ 5

b.    "empty mileage, permits, tolls, ferries, detention and accessorial services unless otherwise provided" in the ICOA; *Id.* at p. 2 ¶ 6

c.    "workers' compensation insurance or an alternative acceptable to [Defendant ATS]"; *Id.* at p. 2 ¶ 7.

133.    During Plaintiffs' employment, Defendants made unlawful deductions from Plaintiffs' pay, including deductions for lease payments, fuel, oil, maintenance, tolls, Qualcomm maintenance fees, and other miscellaneous fees ("Wage Assignment and Deduction Policy").

134.    The wage assignments tendered pursuant to Defendants' Wage Assignment and Deduction Policy were not accompanied by a true and complete copy of the instrument assigning or transferring such wages in violation of Minnesota law. M.S.A. § 181.04

135.    The deductions made pursuant to Defendants' Wage Assignment and Deduction Policy were not pursuant to a written agreement, and the deductions were not made for the purpose of paying union dues, life insurance premiums, hospitalization or any of the other reasons permitted by Minnesota law. *See* M.S.A. § 181.06 Subd. 2.

136.    Many of the wage assignments made pursuant to Defendants' Wage Assignment and Deduction Policy were intended to secure loans of less than $200 but were not filed and recorded with the clerk of the city or town that Defendants reside in, in violation of Minnesota law.  M.S.A. § 181.07.

137.    Many of the wage assignments made pursuant to Defendants' Wage Assignment and Deduction Policy were made by married individuals; however, Defendants failed to obtain the written consent of the married individuals' spouses before making said assignments, in violation of Minnesota law.  *Id.*

138.    Many of the deductions made pursuant to Defendants' Wage Assignment and Deduction Policy were for claimed indebtedness running from Plaintiffs to Defendants and were not voluntarily authorized by Plaintiffs after any such claimed losses occurred, in violation of Minnesota law.  M.S.A. § 181.79 Subd. 1.

139.    The deductions made pursuant to Defendants' Wage Deduction Policy were not for the benefit of the employee.

140.    The deductions made pursuant to Defendants' Wage Deduction Policy were not made in response to a valid wage assignment.

141.    Pursuant to Defendants' Wage Deduction Policy, Plaintiffs frequently were denied wages.

**Violations of the Truth-in-Leasing Act**
**(Named Plaintiff and Class Plaintiffs v. Defendants)**

142.    The foregoing paragraphs are incorporated herein as if set forth in full.

143.    To help facilitate the interstate and intrastate delivery of freight, Defendant ATS Trucking enters/entered into substantively similar and/or identical ICOAs with Named Plaintiff and Class Plaintiffs.

144.    These ICOAs purport to lease, on behalf of Defendant ATS Trucking, commercial trucks and driving services from Named Plaintiff and Class Plaintiffs.

145.    Upon information and belief, the trucks provided by Plaintiffs are either leased from Defendant ATS Leasing or other truck leasing entities that have entered into agreements with Defendant ATS Trucking to lease trucks to individuals participating in the lease purchase program on terms favorable to Defendant ATS Trucking.

146.    Under federal law and regulations, "authorized motor carriers" such as Defendant ATS Trucking may perform authorized transportation in equipment that they do not own *only* if the equipment is covered by a written lease meeting the requirements set forth in 49 C.F.R. § 376.12.  *See* 49 C.F.R. § 376.11(a).

147.    The ICOAs do not conform to the requirements set forth in 49 C.F.R. § 376.12.

148.    The ICOAs do not conform to 49 C.F.R. § 376.12(a) because they contain several provisions that violate the Truth-in-Leasing Regulations, such as, by way of example only:

> a. Paragraph 15 of the ICOAs states that "To the extent any such claim is not covered by insurance provided by [Defendants] or [Plaintiffs], [Plaintiffs] agree to defend, indemnify and hold [Defendants] harmless from any direct, indirect or consequential loss, damage, fine, expense, including reasonable attorneys fees, action for injury to persons, including, death, and loss of or damage to property, and operational delay charges for late deliveries that [Defendants] my incur arising out of or in connection with [Plaintiffs'] operation of the Equipment or [Plaintiffs'] obligations under this Agreement or breach thereof. This provision impermissibly seeks to limit Defendants' exclusive possession,

control and responsibility concerning the operation of the vehicles, in violation of 49 C.F.R. § 376.12(c)(1).

b.  Paragraph 7 of the Lease Agreements states that [Plaintiffs] shall indemnify, defend, and hold [Defendants] and [Defendants'] assigns harmless from and against any claim (including any for which [Defendant are] not indemnified by [Defendants'] insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that [Defendants incur] arising out of [Plaintiffs'] (including [Plaintiffs'] agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions in inspecting, maintaining, or using the Equipment or otherwise performing, or failing to perform, [Plaintiffs'] obligations under this Lease." This provision impermissibly seeks to limit Defendants' exclusive possession, control, and responsibility concerning the operation of the vehicles, in violation of 49 C.F.R. § 376.12(c)(1).

c.  Paragraph 2 of Attachment 3 to the Lease Agreements states in part that "The specific items to which the General Reserve Account may be applied are: all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by Lessor that are Lessee's responsibility under this Lease."  Said provision is impermissibly vague as it permits Defendants to charge back against Plaintiffs' compensation an undefined amount in violation of 49 C.F.R. § 376.12(h) and does clearly state Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(d).

d.  Paragraph 3 of Attachment 8 to the Lease Agreements states in pertinent part "**CHANGES IN EXISTING DEDUCTION ITEMS**.  If an item in any of the above columns will be changing, [Plaintiffs] shall be so notified by personal delivery, fax, or other written notice."  Said provision authorizes Defendants to unilaterally change amounts that it may charge back against Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(e), as it does not state with specificity the responsibility of each party with respect to the costs incurred via the operation of the equipment.  It is further impermissibly vague as it permits Defendant ATS Trucking to charge back against Named Plaintiff and Class Plaintiffs' compensation an undefined amount, in violation of 49 C.F.R. § 376.12(h), and does not clearly state Named Plaintiff and Class Plaintiffs' compensation in violation of 49 C.F.R. § 376.12(d).

e.  Paragraph 17 of the Lease Agreements states that "[Plaintiffs] shall be responsible for all expenses relating to regular maintenance of engine, drive-train, axles, brakes, and all other electrical and mechanical systems (including complying with the Preventive Maintenance Schedule set forth in Attachment 9), repairs of damage to the Equipment necessary to its continued safe and efficient operation, expenses necessary to make the Equipment conform to any federal, state, or municipal requirements, and all lubricants, parts, and supplies involved in such maintenance and repairs."  Said provision is impermissibly vague as it permits Defendants to unilaterally schedule maintenance and charge back against Named Plaintiff and Class Plaintiffs' compensation undefined amounts for same, in violation of 49 C.F.R. § 376.12(h), and does not clearly

state Named Plaintiff and Class Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(d).

f.  Paragraph 5 of the ICOAs states that "[Plaintiffs] are responsible for paying all operating expenses, including all expenses of fuel, oil, maintenance and repairs to the Equipment, road taxes, mileage taxes, vehicle insurance, fuel taxes, fines for parking, moving or weight violations, personal expenses while on the road or any other levies or assessments."  Said provision is impermissibly vague as it contains a non-exhaustive list of potential charge-backs against Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(h), and does not clearly state Named Plaintiff and Class Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(d).

g.  In regards to the purchase of products, equipment and services from Defendants, Paragraph 23 of the Lease Agreements states that "Amounts due for such products, equipment or services purchased through [Defendants] will include the cost of such items and may include amounts to cover [Defendants'] administrative cost, either direct or indirect, of securing, offering and maintaining such products, equipment and services."  Said provision permits Defendants to charge back against Named Plaintiff and Class Plaintiffs' compensation administrative costs in undefined amounts, in violation of 49 C.F.R. § 376.12(h), and does not clearly state Named Plaintiff and Class Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(d).

h.  Paragraph 1 of Attachment 1 to the Lease Agreements authorizes Defendants to charge back against Named Plaintiff and Class Plaintiffs' compensation

"Lease Payments and all other items owed to [Defendant ATS Leasing] … in varying amounts communicated by [Defendant ATS Leasing] to [Defendant ATS Trucking] each week." *See* Lease Agreement, *attached hereto as* Exhibit B at p. 16 § 1. Said provision does not state with specificity the responsibility of each party with respect to costs incurred via the operation of the equipment, in violation of 49 C.F.R. § 376.12(e), and is impermissibly vague as it permits Defendant ATS Trucking to charge back against Named Plaintiff and Class Plaintiffs' compensation an undefined amount, in violation of 49 C.F.R. § 376.12(h), and does not clearly state Named Plaintiff and Class Plaintiffs' compensation, in violation of 49 C.F.R. § 376.12(d.

i.  Paragraph 3 of the ICOAs states that "[Defendants] agree to settle with [Plaintiffs] as stated in Attachment 1 within 15 days after [Plaintiffs] give [Defendants] the logs required by the Federal Department of Transportation and those documents necessary for [Defendants] to be paid by the customer. All settlements shall be final and cannot be questioned or disputed by either party unless notice is given to the other party within 30 days of the settlement." Said provision unlawfully sets a time limit for submission by Plaintiffs of documents required for payment, in violation of 49 C.F.R. § 376.12(f).

149.  The conduct and business practices of authorized motor carriers must comply with the Truth-in-Leasing regulations, whether or not their written lease agreements satisfy the requirements of the regulations. *See* 49 C.F.R. § 376.12.

150.  Defendants conduct does not conform to the requirements set forth in 49 C.F.R. § 376.12, such as, by way of example only, Plaintiffs were required to purchase insurance, satellite

communication equipment, and maintenance services from Defendants, in violation of 49 C.F.R. § 376.12(j).

151.    As a result of Defendants' violations of 49 C.F.R. § 376.12(d) and (h), Named Plaintiff and Class Plaintiffs were disadvantaged by a lack of transparency in their contractual relationship with Defendants, resulting in damages.

152.    The above violations are mere examples of the written lease violating substantial provisions of the TILA.  Moreover, many of the violations stated herein violate multiple sections of the TILA even where only one specific section is cited.

### Defendants' Violations of the Federal Forced Labor Statute
### (Named Plaintiff and Class Plaintiffs v. Defendants)

153.    The foregoing paragraphs are incorporated herein as if set forth in full.

154.    Defendants forced Plaintiffs to labor for them for long periods of time, under terms that employees would never be bound to follow.

155.    Defendants also benefited financially from knowingly participating in the scheme outlined herein.

156.    The Lease Agreement states that Named Plaintiff and Class Plaintiffs' failure "to timely perform any covenant, condition or obligation other than remittance of the Lease Payments," which includes failing to perform interstate and intrastate delivery of freight exclusively for Defendant ATS Trucking, would result in the driver's default of the Lease Agreement immediate liability for all Lease Payments as well as the Stipulated Loss Value stated in the Lease Agreement.

157.    These provisions in the Lease Agreement exposed Named Plaintiff and Class Plaintiffs to tens if not hundreds of thousands of dollars in liability if their ICOAs were to be terminated by Defendant ATS Trucking.  By way of example only, at the time of his termination,

Named Plaintiff's remaining Lease Payments totaled approximately $16,380 and his Stipulated Loss Value totaled approximately $135,162, purportedly exposing Named Plaintiff to at least approximately **$151,542** in liability for ending his employment with Defendants.

158.    Even though Plaintiffs are tied to working for Defendants for a long period of time and are subject to large amounts of liability were Defendants to terminate their agreements, Defendants have the ability to constructively terminate the contract by failing to provide assignments to Plaintiffs.  Defendants are not contractually obligated to provide assignments to Plaintiffs, and if Plaintiffs do not receive assignments from Defendants (Plaintiffs' sole source of revenue), deductions for lease payments are not made, resulting in the driver defaulting on the Lease Agreement.  In such a default, all payments remaining on the lease as well as the Stipulated Loss value become immediately due (subjecting Plaintiffs to potentially more than $100,000 in debt), and Defendant ATS Leasing may repossess the truck.  Such repossession further would leave Plaintiffs in default of the ICOAs, allowing Defendant ATS Trucking to immediately terminate the ICOAs.

159.    Defendants' ability to put Plaintiffs in default of the Lease Agreement at any time provides Defendants with further means to maintain exclusive control over the lease operators' work, and forces lease operators to accept work at sub-minimum wage levels.

160.    Plaintiffs are unable to terminate the ICOAs because doing so would leave them in immediate default of the Lease Agreement, resulting in the same severe financial penalties as if Defendants had terminated the ICOAs.

161.    Defendants' scheme is designed to force the continued labor of Plaintiffs by using threats of serious financial harm through explicit threats to impose, enforce, and collect significant debts.

**Violations of the Minnesota Consumer Small Loans Act**
**(Named Plaintiff and Class Plaintiffs v. Defendants)**

162.    The foregoing paragraphs are incorporated herein as if set forth in full.

163.    Defendants provided loans, which were equal to or less than $350, to Named Plaintiffs and Class Plaintiffs in exchange for a service fee, which was typically $1.25 per transaction.

164.    The loans provided to Named Plaintiffs and Class Plaintiffs were for personal items.

165.    Specifically, Named Plaintiffs and Class Plaintiffs were able to request a loan from Defendants by sending a message over Defendants' on-board computer messaging system that is accessible from the cab of each of Defendants' trucks.

166.    When making such a request, Named Plaintiffs and Class Plaintiffs were required to inform Defendants whether the loans were for personal or work-related matters.

167.    Upon requesting a loan, Defendants provided the amount of the approved loan to Named Plaintiffs and Class Plaintiffs by either (1) crediting an account that was linked to their Comdata cards upon which named Plaintiffs and Class Plaintiffs could immediately draw; or (2) Defendants agreeing to pay Named Plaintiffs and Class Plaintiffs the amount loaned to Named Plaintiffs and Class Plaintiffs through payment of a Comdata check.

168.    In exchange for the payments made to Named Plaintiffs and Class Plaintiffs as loans, Named Plaintiffs and Class Plaintiffs incurred a debt to Defendants which required Named Plaintiffs and Class Plaintiffs to repay the amount of the loan in addition to the transactional service fee.

169.    Defendants generally recouped the debt of the loan by withdrawing the amount of the loan, plus the incurred service fee, on the next settlement statement issued to Named Plaintiffs and Class Plaintiffs.

170.    However, where the drivers' next settlement could not cover the amount of the loan, Defendants still required that the loan be repaid.

171.    According to the ICOAs *and* the Lease Agreements, in exchange for the loan, Defendants were entitled to ensure repayment of the loan, plus the service fee, by: 1) debiting the amount directly from the drivers' settlement; and/or (2) debiting the amount from the drivers' escrow account (an account that belonged to the driver).

172.    Upon information and belief, Defendants are not licensed to provide small loans in the state of Minnesota.

173.    Upon information and belief, Defendants, who are not financial institutions, did not file with the commissioner of labor as consumer small loan lenders prior to engaging in the business of making consumer loans.  M.S.A. § 47.60 Sub. 2(c).

174.    Under the terms of the Agreements signed by Named Plaintiff and Class Plaintiffs, Defendants secured the repayment of all loan(s) made to Named Plaintiff and Class Plaintiffs by allowing themselves to take the amount(s) owed from Named Plaintiff and Class Plaintiffs from their pay and/or escrow accounts.

175.    The loans made to Named Plaintiff and Class Plaintiffs were due upon the next payday of Named Plaintiff and Class Plaintiffs, which was typically within one week and resulted in a loan term of less than 30 calendar days.  M.S.A. § 47.60 Subd. 3.

176.    Defendants failed to provide the required loan contract and disclosures to Named Plaintiffs and Class Plaintiffs prior to distributing the loan proceeds.  *See* M.S.A. § 47.601 Subd. 3(c).

177.    Defendants failed to, upon repayment of the loan in full, mark indelibly every obligation signed by Named Plaintiff and Class Plaintiffs with the word "Paid" or "Canceled" within 20 days of each such repayment, in violation of M.S.A. § 47.60 Subd. 4(d).

178.    Defendants regularly provided small loans to Named Plaintiffs which resulted in the principal of all small loans exceeding $350, in violation of M.S.A. § 47.60 Subd, 2(f).

179.    These cited practices are mere examples of Defendants' conduct in violation of the Minnesota Consumer Small Loans Act as Defendants have violated numerous other provisions of the Act.

180.    Defendants violations of the Minnesota Consumer Small Loans Act were not the result of a mistake or "bona fide error" as set forth under 15 U.S.C. § 1640(c).  M.S.A. § 47.601 Subd. 6(a).

181.    As a consequence of the aforementioned practices of Defendants, the small consumer loans that Defendants regularly made to Named Plaintiffs and Class Plaintiffs are void and Named Plaintiffs and Class Plaintiffs were not obligated to repay any amounts purportedly owed to Defendants.  M.S.A. § 47.601 Subd. 6(b).

182.    Defendants unlawfully collected, received, and retained the principal and fees for each small loan made to Named Plaintiffs and Class Plaintiffs.

183.    Defendants' violations of the Minnesota Consumer Small Loans Act injured Named Plaintiffs and Class Plaintiffs.

**COUNT I**
**Violations of the Fair Labor Standards Act ("FLSA")**
**(Failure to Pay Minimum Wage)**
**Named Plaintiff and Collective Plaintiffs v. Defendants**

184.    The foregoing paragraphs are incorporated herein as if set forth in full.

185.    At all times relevant herein, Defendants were and continue to be "employers" within the meaning of the FLSA.

186.    At all times relevant herein, Named Plaintiff and Collective Plaintiffs were/are "employees" within the meaning of the FLSA.

187.    The FLSA requires employers, such as Defendants, to minimally compensate employees, such as Named Plaintiff and Collective Plaintiffs, at the federal minimum wage rate for each hour worked each workweek.

188.    As a result of Defendants' company-wide practices and policies of not paying its employees at least the federally mandated minimum wage for all hours worked each workweek, Named Plaintiff and Collective Plaintiffs have been harmed.

189.    John Does 1-10 are jointly and individually liable for Defendants' failure to compensate Named Plaintiff and Collective Plaintiffs at least the statutorily mandated federal minimum wage for all hours worked each workweek because they directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices which violated the FLSA.

190.    John Does 11-20 are jointly and individually liable for Defendants' failure to compensate Named Plaintiff and Collective Plaintiffs at least the statutorily mandated federal minimum wage for all hours worked each workweek because they had control over processing payroll for Named Plaintiff and Collective Plaintiffs.

191.    Defendants willfully failed/fail to compensate Named Plaintiff and Collective Plaintiffs the federal minimum wage each workweek.

192.     As a result of Defendants' failure to compensate Named Plaintiff and Collective Plaintiffs at the federal minimum wage rate, Defendants have violated and continue to violate the FLSA.

**COUNT II**
**Violations of Minnesota Law**
**(Unlawful Wage Deductions)**
**Named Plaintiff and Class Plaintiffs v. Defendants**

193.     The foregoing paragraphs are incorporated herein as if set forth in full.

194.     The wage deductions Defendants made from Named Plaintiffs and Class Plaintiffs' pay were and are unlawful pursuant to Minnesota law.  *See* M.S.A. § 181.06 Subd. 2; M.S.A. § 181.79 Subd. 1.

195.     As a result of Defendants' unlawful conduct, Named Plaintiff and Class Plaintiffs have been harmed.

**COUNT III**
**Violations of Minnesota Law**
**(Unlawful Wage Assignments)**
**Named Plaintiff and Class Plaintiffs v. Defendants**

196.     The foregoing paragraphs are incorporated herein as if set forth in full.

197.     The wage assignments Defendants received from Named Plaintiffs and Class Plaintiffs were and are unlawful pursuant to Minnesota law.  *See* M.S.A. §§ 181.07.

198.     The wage assignments tendered pursuant to Defendants' Wage Assignment and Deduction Policy were not accompanied by a true and complete copy of the instrument assigning or transferring such wages in violation of Minnesota law.  M.S.A. § 181.04

199.     As a result of Defendants' unlawful conduct, Named Plaintiff and Class Plaintiffs have been harmed.

**COUNT IV**
**Violations of Minnesota Law**
**(Failure to Pay)**
**Named Plaintiff and Class Plaintiffs v. Defendants**

200.    The foregoing paragraphs are incorporated herein as if set forth in full.

201.    Named Plaintiff and Class Plaintiffs are "transitory employees" within the meaning of Minnesota law.  M.S.A. § 181.10.

202.    Defendants pay structure and wage deduction practices and policies caused Named Plaintiff and Class Plaintiffs to receive wages so infrequently that, at times, Named Plaintiffs and Class Plaintiffs did not receive any wages for more than 15 days or at least every 31 days, in violation of Minnesota law.  M.S.A. § 181.10-181.101.

203.    Additionally, as a result of Defendants' pay structure and wage deduction practices, Defendants failed to pay Named Plaintiff and Class Plaintiffs, who are transitory employees, their earned wages within 24 hours of their termination. M.S.A. § 181.11, 181.13.

204.    As a result of Defendants' unlawful conduct, Named Plaintiffs and Class Plaintiffs have suffered damages.

**COUNT V**
**Violations of the Minnesota Consumer Small Loans Act**
**Named Plaintiff and Class Plaintiffs v. Defendants**

205.    The foregoing paragraphs are incorporated herein as if set forth in full.

206.    Defendants' conduct violated the Minnesota Consumer Small Loans Act

207.    As a result of Defendants' unlawful conduct, Named Plaintiff and Class Plaintiffs have suffered damages and are entitled to the following remedies:

(1) all money collected or received in connection with the loan;

(2) actual, incidental, and consequential damages;

(3) statutory damages of up to $1,000 per violation;

(4) costs, disbursements, and reasonable attorney fees; and

(5) injunctive relief.

## COUNT VI
### Violations of the Truth in Leasing Act
**Named Plaintiff and Class Plaintiffs v. Defendant ATS**

208. The foregoing paragraphs are incorporated herein as if set forth in full.

209. The ICOAs provided to Named Plaintiff and Class Plaintiffs violate numerous provisions of the Truth in Leasing Act.

210. As a result of Defendant ATS' conduct, Named Plaintiff and Class Plaintiffs have suffered damages.

## COUNT VII
### Violations of the Federal Forced Labor Statute
**Named Plaintiff and Class Plaintiffs v. Defendants**

211. The foregoing paragraphs are incorporated herein as if set forth in full.

212. Defendants obtained the continuous labor of Plaintiffs by using threats of serious financial and professional harm.

213. Defendants operated a scheme, plan or pattern intended to cause Plaintiffs to believe that non-performance of labor would result in serious financial and professional harm.

214. Defendants' conduct violation the federal forced labor statutes, 18 U.S.C. §§ 1589 and 1595.

## COUNT VIII
### Violations of the Common Law
### Unjust Enrichment
**Named Plaintiff and Class Plaintiffs v. Defendants**

215. The foregoing paragraphs are incorporated herein as if set forth in full.

216.    Defendants were unjustly enriched by enforcing unlawful liquidated damages provision in contracts to enrichen Defendants financially and to obtain labor from Plaintiffs at sub-market rates.

217.    Such liquidated damages provisions operated as a penalty for nonperformance and were not intended to be fair compensation for any injury caused by a breach of contract. *See Gorco Constr. Co. v. Stein*, 256 Minn. 467, 481 (1959).

218.    As a result of Defendants' conduct, Named Plaintiff and Class Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs pray that this Court enter an Order providing that:

(1)     Defendants are to be prohibited from continuing to maintain their policies, practices or customs in violation of federal law, state laws and principles of equity;

(2)     Defendants are to compensate, reimburse, and make Named Plaintiff, Collective and Class Plaintiffs whole for any and all pay and benefits they would have received had it not been for Defendants' illegal actions, including but not limited to past lost earnings.  Named Plaintiff, Collective and Class Plaintiffs should be accorded those benefits illegally withheld;

(3)     Named Plaintiff, Collective and Class Plaintiffs are to be awarded liquidated, statutory and/or punitive damages as applicable under the laws they are suing;

(4)     Named Plaintiff, Collective, and Class Plaintiffs are to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

(5)     Named Plaintiff, Collective, and Class Plaintiffs are to be awarded equitable relief, including disgorgement of profits and other relief deemed appropriate by the Court;

(6)     Any and all other equitable relief which this Court deems fit; and

(7)     A trial by jury.

Date: July 24, 2020                                      Respectfully Submitted,

                                                        /s/Joseph C. Hashmall
                                                        Joseph C. Hashmall, Esq. (# 392610)

                                                        E. Michelle Drake, Esq. (#387366)

                                                        **BERGER MONTAGUE PC**

                                                        43 SE Main Street, Suite 505

                                                        Minneapolis, MN 55414

                                                        Phone: (612) 594-5999

                                                        Fax: (612) 584-4470

                                                        emdrake@bm.net

                                                        jhashmall@bm.net

                                                        Travis B. Martindale-Jarvis, Esq.*

                                                        Richard S. Swartz, Esq.*

                                                        Justin L. Swidler, Esq.*

                                                        **SWARTZ SWIDLER, LLC**

                                                        1101 Kings Highway North, Suite 402

                                                        Cherry Hill, NJ 08034

                                                        Phone: (856) 685-7420

                                                        Fax: (856) 685-7417

                                                        *pro hac vice* forthcoming

                                                        Attorneys for Plaintiff

## DEMAND TO PRESERVE EVIDENCE

All Defendants are hereby directed to preserve all physical and electronic information pertaining in any way to Named Plaintiff's, Collective Plaintiffs, and Class Plaintiffs' employment and/or contractual relationship with Defendants, to Named Plaintiff's, Collective Plaintiffs, and Class Plaintiffs' cause of action and/or prayers for relief, and to any defenses to same, including, but not limited to, electronic data storage, Defendants' marketing materials (including its website), orientation materials, complaints made by any driver regarding pay, closed circuit TV footage, digital images, computer images, cache memory, searchable data, emails, Qualcomm messages, driver logs, spreadsheets, employment files, settlement statements, pay information, deduction information, ICOAs, Lease Agreements memos, text messages, any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, Twitter, MySpace, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

Date: July 24, 2020

Respectfully Submitted,

/s/Joseph C. Hashmall
Joseph C. Hashmall, Esq. (# 392610)
E. Michelle Drake, Esq. (#387366)
**BERGER MONTAGUE PC**
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
Fax: (612) 584-4470
emdrake@bm.net
jhashmall@bm.net

Travis Martindale-Jarvis, Esq.*
Justin L. Swidler, Esq.*
Richard Swartz, Esq.*
Joshua S. Boyette, Esq.*
**SWARTZ SWIDLER, LLC**

1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420
Fax: (856) 685-7417

*pro hac vice* forthcoming

Attorneys for Plaintiff