UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

J. RUBIN BUTLER, on behalf of himself and          Case No. 20-CV-1631 (PJS/LIB)
those similarly situated,

                    Plaintiff,

v.                                                                    ORDER

ATS INC.; ATS SPECIALIZED, INC.; JOHN
DOES 1–20; and COMPETITIVE
EQUIPMENT SALES,

                    Defendants.

Justin L. Swidler, Manali Arora, Joshua Boyette, and Travis Martindale-Jarvis, SWARTZ SWIDLER LLC; E. Michelle Drake and Joseph Hashmall, BERGER & MONTAGUE, P.C., for plaintiff.

Christopher Eckhart, Elizabeth M. Bolka, and James A. Eckhart, SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.; Brian A. Wood and Matthew D. Sloneker, LIND JENSEN SULLIVAN & PETERSON, PA, for defendants.

Plaintiff J. Rubin Butler worked as a truck driver for defendant ATS Inc. ("ATS") from May 2017 until about March 2019. Butler was designated as an independent contractor and participated in ATS's lease-purchase program, through which he leased a truck from defendant Competitive Equipment Sales ("Competitive"). In order to become a lease-purchase driver, Butler had to sign contracts with ATS and Competitive (which are affiliates), and those contracts contained arbitration clauses. Butler ultimately discovered that working as an independent contractor for ATS was not as

lucrative as he was (allegedly) promised.  Butler now brings this putative class and

collective action against defendants ATS, ATS Specialized, Inc.,[1] and Competitive.

Butler alleges that defendants violated the Fair Labor Standards Act ("FLSA"), the

Truth in Leasing Act, the Federal Forced Labor Statute, the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), multiple Minnesota statutes, and Minnesota

common law.

This matter is before the Court on defendants' second motion to compel

arbitration.[2]  For the reasons that follow, defendants' motion is granted, and the parties

are ordered to arbitrate Butler's claims.

I.  BACKGROUND

ATS is a truckload carrier that operates throughout the United States and

Canada.  Am. Compl. ¶ 17.  To attract drivers, ATS runs print and digital

advertisements describing a variety of work opportunities.  Goering Decl. ¶ 2 & Exs. 1,

2.  Drivers can choose to operate as an employee or as an independent contractor and to

drive a van or a flatbed truck.  *Id.* Ex. 2; Arradizadeh Decl. ¶ 2.  If a driver wants to

work for ATS as an independent contractor and drive a truck—but does not own a

---

[1]ATS Specialized, Inc. is a wholly owned subsidiary of ATS.  Am. Compl. ¶ 17.
The Court refers to these entities collectively as "ATS."

[2]Defendants withdrew their first motion to compel arbitration after Butler filed
an amended complaint.  ECF No. 31.

truck—the driver can lease a truck[3] from Competitive through the lease-purchase

program.  Goering Decl. ¶ 4; Schaffler Decl. ¶¶ 2–3.  In the lease-purchase program, a

driver signs a year-long lease, with the option to purchase the leased truck for a

stipulated amount at the end of the lease period.  Goering Decl. Ex. 2; Schaffler Decl.

Ex. 3 ¶ 3.  Alternatively, a driver can choose to lease a truck from an unaffiliated third

party or to use his own truck (if he owns one).  Schaffler Decl. ¶¶ 2–3.

    In May 2017, Butler saw one of ATS's advertisements on craigslist.com.[4]  Butler

Decl. ¶ 4.  The exact contents of the advertisement are disputed.  According to Butler,

the advertisement said that if he joined the lease-purchase program, he would receive a

$2,500[5] sign-on bonus and a $4,000 lease-completion bonus, and that drivers could earn

$2,500 each week.  *Id.* ¶ 5.  According to ATS, however, its records show that Butler

clicked on and applied from an advertisement that said that he would receive a $1,500

---

[3]Defendants also refer to the equipment leased through the lease-purchase
program as a "tractor."  *See* ECF No. 34 at 9.  All citations to the parties' briefs are to the
CM/ECF pagination.

[4]In 2016, Butler applied to be an independent contractor in ATS's van division,
but he was not eligible due to moving violations or accidents on his driving record.
Goering Decl. ¶¶ 15–16 & Ex. 4.

[5]In contrast to Butler's declaration, the amended complaint alleges that the
advertisement offered a $4,000 sign-on bonus and a $1,000 lease-completion bonus.
Am. Compl. ¶ 59.  Butler does not explain the discrepancy between his declaration and
his amended complaint.  Butler's brief relies on his declaration, as does the Court.  *See*
ECF No. 38 at 24.

sign-on bonus and a $4,000 lease-completion bonus, and that the top 10% of independent contractors averaged $250,000 annual gross earnings.  Goering Decl. ¶ 17 & Exs. 2, 5.

In any event, Butler clicked on the advertisement, applied online to drive a van as an independent contractor through the lease-purchase program, and then spoke with a recruiter.  *Id.* ¶ 18 & Ex. 5; Butler Decl. ¶ 6.  Butler alleges that the recruiter made six representations to him about ATS's program:  (1) "all drivers make 'good cash'"; (2) Butler "would not experience any 'zero pay' weeks"; (3) ATS would keep him moving, meaning "loaded and/or under dispatch"; (4) he "would be able to choose to either continue leasing any truck or walk away from any truck lease after one year['s] service"; (5) he "would receive a lease completion bonus after one year of service"; and (6) he "could receive home time whenever [he] wished."  Butler Decl. ¶ 6.  Butler says that he relied on these representations in deciding to join the lease-purchase program. *Id.* ¶ 11.

Following their conversation, the recruiter arranged for Butler to travel from Lakeland, Florida to ATS's headquarters in St. Cloud, Minnesota to attend a four-day orientation.  *Id.* ¶ 7.  ATS provided Butler with a "free flight" and a "free hotel," but did not tell Butler whether it would provide return transit if he did not join the lease-

purchase program. *Id.* ¶¶ 7–8. ATS says that its policy[6] is to provide applicants with a bus ticket or funds to rent a car if they choose not to join the program. In fact, ATS provided transportation home for two individuals who attended Butler's orientation but decided not to sign onto the program. Goering Decl. ¶¶ 11, 20.

Butler arrived in Minnesota and began the four-day orientation on May 15, 2017. *Id.* ¶ 19; Arradizadeh Decl. ¶¶ 3–4. According to Butler, there were about 20 other aspiring lease-purchase drivers at the orientation. Butler Decl. ¶ 13. Butler says that he was provided with ATS's Independent Contractor Operating Agreement ("ICOA") and with Competitive's Equipment Lease Agreement ("lease") on a tablet. *Id.* ¶¶ 12, 16. He was not provided with a copy of either agreement before traveling to Minnesota, he did not receive paper copies at the orientation, the agreements were presented "on a 'take-it-or-leave-it' basis," and Butler was required to sign them "then and there" without sufficient time to read the agreements or consult with an attorney. *Id.* ¶¶ 14–21. Further, Butler says that he was not told how much his weekly lease payments would be for his truck—and he was not even allowed to choose a truck—before signing the

---

[6]Butler contends that ATS's evidence of its various policies and procedures is "aspirational." ECF No. 38 at 27. It is unclear what Butler means by this statement. ATS's policies and procedures appear to be admissible (assuming a proper foundation), and under Fed. R. Evid. 406, evidence of "an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice."

agreements. *Id.* ¶¶ 24–26. When the drivers were finally allowed to select their trucks, there were not enough trucks available for all of them. *Id.* ¶ 27.

Defendants dispute much of Butler's version of events and point to business records that contradict many aspects of Butler's testimony. First, ATS's records show that eight potential van contractors (including Butler) and seven potential flatbed contractors were present at the orientation. Goering Decl. Ex. 6. Second, ATS's records show that Butler signed the agreements *after* selecting his truck. The schedule from Butler's orientation indicates that the drivers selected their trucks on May 15 and signed the agreements on May 17, and the agreements themselves show that they were signed on May 17. Dwyer Decl. Ex. 1 (showing orientation schedule, which had truck selection on Monday and signing the agreements on Wednesday); Arradizadeh Decl. Ex. 1 (showing Butler signed the ICOA on May 17, 2017); Schaffler Decl. Ex. 2 (showing Butler signed the lease on May 17, 2017). Third, the lease signed by Butler on May 17 identifies the make, model, base value, and weekly payment amount of the leased equipment, which would not be possible if Butler had to sign the lease before he selected the truck (as he claims), and seems to contradict Butler's claim that he did not know how much his lease payments would be at the time he signed the lease. Schaffler Decl. Ex. 2, Schedule A. Fourth, ATS states that, upon request, it provides drivers with paper copies of the agreements before and during orientation and gives drivers time to

review the agreements and speak with their attorneys. *Id.* ¶¶ 4–5; Arradizadeh Decl.

¶ 3. Finally, Competitive's policy is to provide at least one more truck than driver at

each orientation, and Competitive's records show that there were 11 trucks from which

Butler could choose when it was his turn to select a truck. Schaffler Decl. ¶¶ 7, 9 & Ex 1.

In any event, the parties agree that, by the end of the orientation session, Butler

had signed both the ICOA and a year-long lease for a Freightliner truck. Butler Decl.

¶¶ 12, 30. Each agreement contained an arbitration provision that is relevant to this

litigation. The ICOA's arbitration clause provides:

> Any dispute arising out of or relating to this Agreement,
> including any allegation of breach thereof or alleged
> violation of any governmental regulation cited herein, shall
> be fully and finally resolved by arbitration in accordance
> with the commercial arbitration rules of the American
> Arbitration Association ("AAA"). A demand for arbitration
> . . . shall be filed no later than one (1) year after the dispute
> arises or the claim occurs. Failure to file the demand within
> the one (1) year period shall be deemed full waiver of the
> claim. . . . The parties shall share the cost of arbitration
> equally. Notwithstanding the above, WE may forego
> arbitration and pursue litigation against YOU to recover
> OUR property or any monies that are owed to US by YOU
> under this Agreement. The parties agree that no dispute
> may be joined with the dispute of another and agree that
> class actions under this arbitration provision are prohibited.
> This Agreement shall be deemed to have been drawn in
> accordance with the statutes and laws of the State of
> Minnesota and, in the event of any disagreement or
> litigation, the laws of this state shall apply.

Arradizadeh Decl. Ex. 1 ¶ 28. The arbitration clause in the lease provides:

-7-

(a) To the extent any disputes (including requests for preliminary relief) arise in connection with or relate to this Agreement, including any allegation of a tort, or of breach of this Agreement, or of violations of the requirements of any applicable government authorities, whether local, state, federal, or foreign, including but not limited to the Federal Truth-in-Leasing regulations (49 C.F.R. Part 376), Lessor and Lessee agree to submit such disputes to final and binding arbitration in accordance with (1) the Commercial Arbitration Rules (and related arbitration rules governing requests for preliminary relief) of the American Arbitration Association or of such other arbitration organization as the parties agree on in writing ("AAA"), (2) the Federal Arbitration Act (ch. 1 of tit. 9 of United States Code, with respect to which the parties agree that this Agreement is not an exempt "contract of employment") or, if the Federal Arbitration Act is held not to apply, the arbitration laws of the State of Minnesota, and (3) the procedures set forth below.

(b) The parties intend the arbitrator to decide all issues, including those relating to the scope of this Section, to the maximum extent permitted by law.  Any demand for arbitration shall be filed . . . within two years of the accrual of the claim. . . .

(c) Notwithstanding anything to the contrary contained or referred to in this Agreement, the parties agree that NO CONSOLIDATED OR CLASS ARBITRATIONS SHALL BE ALLOWED and that the arbitrator is not empowered to certify, conduct, or award relief in a consolidated or class arbitration. . . .

(d) Each party shall pay its own AAA arbitration filing fees and an equal share of the fees and expenses of the arbitrator.  In all respects, except to the extent otherwise determined by law, as construed and applied by the

-8-

arbitrator, the parties shall be responsible for their own respective arbitration expenses, including attorneys' fees. . . .

(f) Notwithstanding the mandatory arbitration provision contained above, Lessor may, at its sole discretion pursue a civil lawsuit against Lessee in order to recover any property or equipment belonging to Lessor, and to seek damages related to Lessee's failure to timely return such property or equipment.

Schaffler Decl. Ex. 2 ¶ 31.

Following the orientation, Butler began working for ATS. His work took him to nearly every state, and he interacted with customers and other drivers throughout the country. Butler Decl. ¶¶ 33–89. In or around May 2018, defendants ordered Butler back to their St. Cloud headquarters. *Id.* ¶ 90. Competitive told Butler that it had decided to sell his Freightliner truck and that he would not be allowed to renew the lease on that truck for a second year. *Id.* ¶ 91. Apparently, this was because the truck had more than 450,000 miles on it, and when a truck accumulates that much mileage, Competitive's policy is to sell the truck at the end of the lease.[7] Schaffler Decl. ¶ 11. Defendants also told Butler that he would be required to sign a new lease on a different truck and a new ICOA in order to receive the lease-completion bonus at the end of his first year. Butler

---

[7]Competitive says that, pursuant to its policy, it "would have informed [Butler] that it intended to put the truck up for sale at the conclusion of Butler's lease unless Butler chose to buy the truck under the purchase option in his Lease Agreement." Schaffler Decl. ¶ 11. Butler's declaration does not discuss being given the option to purchase the Freightliner truck.

Decl. ¶ 93.  Even though Butler wanted to continue leasing the Freightliner, he

ultimately decided to sign a lease on a Peterbilt truck and to sign a second ICOA.  *Id.*

¶¶ 92, 95.  This second set of agreements had the same arbitration provisions as the first

set.  *Compare* Arradizadeh Decl. Ex. 2 ¶ 28, *and* Schaffler Decl. Ex. 3 ¶ 31, *with*

Arradizadeh Decl. Ex. 1 ¶ 28, *and* Schaffler Decl. Ex. 2 ¶ 31.

After signing the new documents, Butler received his $4,000 lease-completion

bonus.  Butler Decl. ¶¶ 96–97.  Butler received a check for $967.20, and the remaining

$3,032.80 was used to pay off a debt that he owed to ATS.  *Id.* ¶ 97; Schaffler Decl. ¶ 13.

In 2018, Butler worked exclusively for ATS.  He earned $163,731 in gross income,

but because he had $148,493 in expenses, his net income was $15,238.  Butler Decl.

¶¶ 106–07.  Butler says that he stopped working for ATS in or around March 2019.  *Id.*

¶ 2.  ATS says that its records show that Butler was terminated (effective April 5, 2019)

due to a disagreement over safety protocols.  Goering Decl. Ex. 3, at 19.  This lawsuit

followed.

## II.  ANALYSIS

### A.  Standard of Review

A motion to compel arbitration "is properly analyzed under either Rule 12(b)(6)

or Rule 56."  *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017);

*see also Engen v. Grocery Delivery E-Servs. USA Inc.*, 453 F. Supp. 3d 1231, 1236 (D. Minn.

2020), *appeal docketed*, No. 20-1923 (8th Cir. May 5, 2020).[8]  If no declarations or exhibits are introduced, the motion is evaluated under Fed. R. Civ. P. 12(b)(6); if, however, matters outside of the pleadings are introduced, Fed. R. Civ. P. 56(a) governs.  *Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741–42 (8th Cir. 2014); *Engen*, 453 F. Supp. 3d at 1236.  In this case, both parties have submitted declarations and exhibits.  The Court therefore considers the motion under the summary-judgment standard.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

---

[8]These cases consider motions to compel arbitration under the Federal Arbitration Act.  The Court could find no cases suggesting that the standard of review is different for motions to compel brought under the Minnesota Revised Uniform Arbitration Act.  The two statutes require similar inquiries when a party moves to compel arbitration, *see Michels Holdings, Inc. v. Pro. Drain Servs., Inc.*, Nos. 14-211 (MJD/JSM), 14-708 (MJD/JSM), 2014 WL 3631678, at *3 (D. Minn. July 22, 2014), and thus the Court will apply a similar standard of review.

B. *Governing Law and Preemption*

Defendants have moved to compel arbitration.  The parties agree that this Court cannot compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* Section 1 of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  Regardless of whether Butler was working for ATS as an independent contractor or as an employee, he was within a "class of workers engaged in . . . interstate commerce," and thus the FAA does not apply to his contracts with ATS and Competitive.  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537, 544 (2019).[9]

The question, then, is whether this Court can compel arbitration under the Minnesota Revised Uniform Arbitration Act ("MRUAA"), Minn. Stat. § 572B.01 *et seq.*[10]

_____

[9]The lease's arbitration clause states that the lease is *not* exempt under § 1 of the FAA.  Schaffler Decl. Ex. 3 ¶ 31(a).  This language is not dispositive, however, as *New Prime* instructed that "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration."  139 S. Ct. at 537. Moreover, defendants concede that their agreements with Butler are exempt under § 1. *See* ECF No. 39 at 7–10.

[10]Defendants argue, and Butler concedes, that if the arbitration clauses are valid and enforceable, all defendants can enforce them under the principle of equitable estoppel, even though all defendants are not signatories to any particular agreement. Equitable estoppel "allows a nonsignatory to compel arbitration" when "the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of

(continued...)

Butler argues that the answer is "no" because, he says, § 1 of the FAA preempts application of the MRUAA to his federal claims.

Butler's preemption argument faces an uphill battle. The doctrines of express preemption and field preemption do not apply because the Supreme Court has held that the "FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989). That leaves only conflict preemption, which arises when the application of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

Butler argues that § 1 embodies a broad federal policy that the claims of workers involved in interstate commerce should not be arbitrated under any circumstances, and that applying the MRUAA in this case would conflict with that federal policy. The Court disagrees.

------

[10](...continued)
the signatories to the contract." *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 515–16 (D. Minn. 2014) (citation omitted); *see also In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 922–23 (8th Cir. 2013). The amended complaint alleges that ATS and Competitive are under common ownership, worked together to "execute their scheme," and were Butler's "joint employers." Am. Compl. ¶ 26. Furthermore, the ICOA states that the parties "agree to incorporate" the lease "under this Agreement as a separate attachment." Arradizadeh Decl. Ex. 2 ¶ 5. Given these claims of "substantially interdependent and concerted misconduct," *Rapp*, 302 F.R.D. at 516, the Court finds that equitable estoppel applies and that all defendants may enforce both arbitration clauses.

To begin with, the Supreme Court has stated that the FAA does not "prevent[] the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself." *Volt*, 489 U.S. at 479.  This is because the primary purpose of the FAA is to "ensur[e] that private agreements to arbitrate are enforced according to their terms." *Id.*

More importantly, Butler's argument treats § 1 as a *prohibition*.  In other words, Butler reads § 1 to prohibit any arbitration of the claims of workers involved in interstate commerce under any law, federal or state.  But § 1 is an *exemption*, not a *prohibition*.  Section 1 provides that "nothing herein"—i.e., nothing in the FAA—"shall apply" to the contracts of workers engaged in interstate commerce.  Clearly, then, Section 1 merely exempts the contracts of workers engaged in interstate commerce from *one* law—the FAA—leaving those contracts subject to all other relevant federal and state laws.

Butler relies on *New Prime* to support his interpretation of § 1 as a prohibition, but his reliance is misplaced.  *New Prime* held only that, when § 1 applies, a court "lack[s] authority *under the Act* to order arbitration."  139 S. Ct. at 544 (emphasis added). *New Prime* did not hold that, when § 1 applies, a court cannot order arbitration under state law or another source of authority.  To the contrary, the Supreme Court explicitly declined to determine whether, when § 1 applies, a court can nevertheless compel

-14-

arbitration through its "inherent authority" or "other potential avenues." *Id.* at 543; *see also Merrill v. Pathway Leasing LLC*, No. 16-cv-02242-KLM, 2019 WL 1915597, at *2 (D. Colo. Apr. 29, 2019) ("[T]he Supreme Court left open the possibility that a truck driver working for an interstate trucking company . . . who had signed an arbitration agreement *could still be compelled to arbitration . . . .*").

Not surprisingly, the vast majority of courts to have reached the question reject Butler's interpretation of § 1 and hold that § 1 does not preempt state arbitration laws because "the effect of Section 1 is merely to leave the arbitrability of disputes in the excluded categories as if the [FAA] had never been enacted."[11]  *Mason-Dixon Lines, Inc.*

---

[11]Butler cites four cases in support of his argument that § 1 preempts application of state arbitration laws, but none of them are helpful.  Both *Martins v. Flowers Foods, Inc.*, 463 F. Supp. 3d 1290, 1298 (M.D. Fla. 2020), and *Bissonette v. Lepage Bakeries Park St., LLC*, 460 F. Supp. 3d 191, 197 n.7 (D. Conn. 2020), considered arbitration clauses in which the parties themselves expressly provided that, if arbitration could not be compelled under the FAA, it also could not be compelled under state law.  In other words, *Martins* and *Bissonette* did not hold that arbitration was foreclosed by *§ 1*; instead, they held that arbitration was foreclosed by *the parties' agreements*.  The agreements in this case do not contain similar clauses.

Next, *Ward v. Express Messenger Systems, Inc.*, 413 F. Supp. 3d 1079, 1087 (D. Colo. 2019), does not address whether a court can compel arbitration under state law when the court cannot compel arbitration under the FAA because of the application of § 1.

Finally, *Johnson v. Armstrong Transfer & Storage Co., Inc./Armstrong Relocation Co.*, No. 2018-CA-000769-MR, 2019 WL 3763630, at *3 (Ky. Ct. App. Aug. 9, 2019), did hold that state law was preempted when § 1 exempts a case from the FAA.  But *Johnson* is poorly reasoned and an outlier.  *Johnson* based its decision on *Saneii v. Robards*, which held that the "FAA, *where applicable*, preempts all state law."  289 F. Supp. 2d 855, 858

(continued...)

*v. Loc. Union No. 560, Int'l Brotherhood of Teamsters*, 443 F.2d 807, 809 (3d Cir. 1971).[12]  The

Court fully agrees with this reasoning and concludes that § 1 of the FAA does not

prohibit this Court from compelling arbitration of Butler's claims under the MRUAA.

---

[11](...continued)

(W.D. Ky. 2003) (emphasis added).  *Johnson* did not seem to recognize that *Saneii* is irrelevant when the FAA is *not* applicable, as was true in *Johnson*, and as is true in this case.  The *Johnson* court also cited *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984), but that case simply held that the FAA "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements."  Here, compelling arbitration under the MRUAA *supports* the enforceability of arbitration agreements.

[12]*See, e.g.*, *Davis v. EGL Eagle Glob. Logistics L.P.*, 243 F. App'x 39, 44 (5th Cir. 2007); *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 596 (3d Cir. 2004); *Green v. U.S. Xpress Enters., Inc.*, 434 F. Supp. 3d 633, 640–42 (E.D. Tenn. 2020); *Byars v. Dart Transit Co.*, 414 F. Supp. 3d 1082, 1087–88 (M.D. Tenn. 2019); *Merrill*, 2019 WL 1915597, at *2–5; *Atwood v. Rent-A-Center E., Inc.*, No. 15-cv-1023-MJR-SCW, 2016 WL 2766656, at *3 (S.D. Ill. May 13, 2016); *Diaz v. Mich. Logistics Inc.*, 167 F. Supp. 3d 375, 381 (E.D.N.Y. 2016); *Roberts v. Cent. Refrigerated Serv.*, 27 F. Supp. 3d 1256, 1260–63 (D. Utah 2014); *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 528–29 (S.D.N.Y. 2003).

Butler next argues that application of the MRUAA[13] is foreclosed because states may not limit "either the substantive rights conferred by federal statutes or the procedural rights granted to litigants by Congress."  ECF No. 38 at 13.  According to Butler, a provision of the MRUAA (Minn. Stat. § 572B.10) conflicts with Fed. R. Civ. P. 23, and thus application of the MRUAA here would allow a state law to overrule a rule of federal procedure.  Such a use of state law to "trump" federal law is foreclosed by *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010).

Butler's *Erie* and reverse-*Erie* arguments are unavailing.  Butler's brief overlooks the distinction between what *laws* can be enacted by a *state* and what *agreements* can be reached by *private parties*.  It is true that the State of Minnesota could not enact a statute

---

[13]Butler cites *UHC Management Co. v. Computer Sciences Corp.*, 148 F.3d 992, 997 (8th Cir. 1998), to argue that a contract's choice-of-law clause cannot impede the FAA's application in federal court.  *UHC* is distinguishable, though.  It considered a contract to which the FAA *applied*, and one party attempted to circumvent the FAA's application by referring to the contract's choice-of-law clause.  In this case, however, the FAA does *not* apply, and so neither party is attempting to circumvent applicable federal law.

Butler also argues that the MRUAA does not apply to contracts involving interstate commerce, citing *Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344 (Minn. 2003). *Onvoy* instructed that "Minnesota courts must apply the FAA to transactions that affect interstate commerce."  *Id.* at 351.  But *Onvoy* was using the phrase "transactions that affect interstate commerce" as shorthand for "transactions governed by the FAA." *Onvoy* was not discussing a case—such as this one—in which a transaction affecting interstate commerce was *exempt* from the FAA.  If the MRUAA could never apply to a contract involving interstate commerce—even when the contract is not governed by the FAA—then the MRUAA would almost never apply, as almost every contract containing an arbitration clause involves interstate commerce.

-17-

prohibiting collective actions without violating *Shady Grove*.  But the MRUAA does not prohibit collective actions; instead, it restricts a court from consolidating separate arbitration proceedings only insofar as "an *agreement* to arbitrate . . . prohibits consolidation."  § 572B.10(c) (emphasis added).  Section 572B.10 is merely a mechanism to enforce private agreements, and parties may agree to limit their federal rights without implicating *Erie* or reverse-*Erie*.  *See Green v. U.S. Xpress Enters., Inc.*, 434 F. Supp. 3d 633, 642 (E.D. Tenn. 2020) (rejecting argument that enforcing arbitration agreement under the Tennessee Uniform Arbitration Act violated Rule 23 because a "party's contractual choice to assert claims individually and not through a class action does not conflict with a statute or procedural rule that would have governed a different choice").

Similarly, the Supreme Court has made clear that a party can voluntarily agree to arbitrate his or her claims under federal statutes, even when those statutes provide for a private right of action in federal court.  *See, e.g., Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000) ("[F]ederal statutory claims can be appropriately resolved through arbitration, and we have enforced agreements to arbitrate that involve such claims."); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (listing the Sherman Act, the Securities Exchange Act, RICO, and the Securities Act as examples of "statutory claims [that] may be the subject of an arbitration agreement"); *Shearson/Am. Express, Inc. v.*

*McMahon*, 482 U.S. 220, 242 (1987) (enforcing arbitration of RICO claims); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1054 (8th Cir. 2013) ("[A]rbitration agreements containing class waivers are enforceable in FLSA cases.").  Plainly, then, agreements to arbitrate federal statutory claims can be enforced under state arbitration laws without creating an *Erie* or reverse-*Erie* problem.  *See Green*, 434 F. Supp. 3d at 644 ("*Epic*'s clear implication is that, even in the absence of the FAA, there is no conflict between the FLSA's provision for collective actions and an employee's right to submit an FLSA claim to an alternative forum.").

For these reasons, the Court concludes that federal law does not preempt the application of the MRUAA to Butler's claims.

## C.  MRUAA

Under the MRUAA, an agreement to arbitrate "is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of contract."  Minn. Stat. § 572B.06(a).  Before compelling arbitration under the MRUAA, a court must determine that (1) there is a valid agreement to arbitrate, and (2) the dispute falls within the agreement's scope.  *City of Rochester v. Kottschade*, 896 N.W. 2d 541, 548 (Minn. 2017).  Butler does not deny that his dispute with defendants falls within the scope of the arbitration clauses, but he argues that those clauses are invalid under both federal and Minnesota law.

### D.  *Enforceability under Federal Law: Effective-Vindication Rule*

Butler argues that the arbitration agreements are invalid under federal law

because they prevent him from effectively vindicating his federal statutory rights.  The

effective-vindication rule emerged from dicta in *Mitsubishi Motors Corp. v. Soler Chrysler-*

*Plymouth, Inc.*, in which the Supreme Court observed that an arbitration clause that

prospectively waived "a party's right to pursue statutory remedies" might be

invalidated on public-policy grounds.  473 U.S. 614, 637 n.19 (1985).  But the Supreme

Court also observed that an arbitration clause will likely be enforced if "the prospective

litigant effectively may vindicate [his] statutory cause of action in the arbitral forum."

*Id.* at 637.  "Subsequent cases have similarly asserted the existence of an 'effective

vindication' exception, but have similarly declined to apply it to invalidate the

arbitration agreement at issue."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235

(2013) (internal citations omitted).

As a preliminary matter, the Court notes two things about the application of the

effective-vindication rule to this case.  First, "[t]he doctrine, at its core, requires

application of the FAA unless the FAA's mandate has been 'overridden by a contrary

congressional command.'"  *Billie v. Coverall N. Am., Inc.*, 444 F. Supp. 3d 332, 350

(D. Conn. 2020) (quoting *Italian Colors*, 570 U.S. at 233); *see also Prasad v. Gen. Elec. Co.*,

No. 2:13-CV-272, 2014 WL 934577, at *3 (S.D. Ohio Mar. 10, 2014) (referring to effective-

vindication rule as an "exception to the FAA").  The effective-vindication rule thus applies in an "all-federal context," when the "FAA is alleged to conflict with another *federal* law."  *Italian Colors*, 570 U.S. at 252 (Kagan, J., dissenting).  The whole point of the effective-vindication doctrine is to identify the point at which one federal statute (the FAA) must give way to another federal statute.  Here, however, the Court has determined that the FAA does not apply *at all* because Butler's claims fall within § 1's exemption for workers engaged in interstate commerce.  The Court can find no case in which the effective-vindication rule has been applied to block enforcement of an arbitration clause under a *state* law, such as the MRUAA.

Second, even if the effective-vindication rule could block enforcement of an arbitration clause under a state law, the rule would block only the arbitration of *federal* claims.  In this case, for example, the rule would not prevent the Court from compelling arbitration of the numerous claims that Butler asserts under state law.  *See id.* ("*AT&T Mobility* involved a *state* law, and therefore could not possibly implicate the effective-vindication rule."); *E.E.O.C. v. Woodmen of World Life Ins. Soc'y*, 479 F.3d 561, 565 (8th Cir. 2007) ("Arbitration agreements encompassing federal statutory claims are enforceable as long as the potential litigant can effectively vindicate her statutory rights through arbitration."); *Andresen v. IntePros Fed., Inc.*, 240 F. Supp. 3d 143, 155 (D.D.C. 2017) ("*Green Tree*, as part of the effective vindication doctrine, can only apply where

federal statutory claims are concerned . . . ."); *Torres v. CleanNet, U.S.A., Inc.*, 90 F. Supp.

3d 369, 377 (E.D. Pa. 2015) ("[T]here is absolutely no rule that prevents arbitration when

a person cannot effectively vindicate his or her state statutory rights.").

Turning now to the merits of Butler's argument:  Butler argues that compelling

him to arbitrate under the MRUAA would make it impossible for him to effectively

vindicate his federal statutory rights for two reasons:  first, because of limits on out-of-

state discovery and, second, because he cannot afford to pay the costs of arbitration.

Both arguments are meritless.

1.  Limited Discovery

Butler argues that he cannot effectively vindicate his federal statutory rights

unless he can take out-of-state discovery, and he cannot take out-of-state discovery if he

is forced to arbitrate.  In his declaration, Butler broadly states that he interacted with

out-of-state drivers, customers, vendors, and others, and that some of these individuals

and entities might have information that is relevant to this lawsuit.  *See* Butler Decl.

¶¶ 33–89.

Butler's declaration is extremely vague.  He does not identify with much

specificity the individuals and entities with relevant information, nor describe that

information, nor explain how that information is relevant to this lawsuit, nor explain

why the individual or entity is unlikely to voluntarily provide the information upon

request.  Moreover, as defendants persuasively argued at the hearing, most of the

claims that Butler is asserting in this lawsuit appear to rest on evidence that is already

within the control of Butler himself or the defendants, leaving little need for out-of-state

discovery directed to non-parties.  *See* ECF No. 43 at 65:21–68:17.

In addition, Butler's premise—that no out-of-state discovery will be possible if

he's forced to arbitrate—is mistaken.  The Revised Uniform Arbitration Act ("RUAA")

enables courts to enforce subpoenas issued by out-of-state arbitrators.[14]  Revised Unif.

Arb. Act § 17(g) (Unif. L. Comm'n 2000) ("The court may enforce a subpoena or

discovery-related order for the attendance of a witness within this State and for the

production of records and other evidence issued by an arbitrator in connection with an

arbitration proceeding in another State . . . .");  *see also id.* cmt. 9 ("Section 17(g) is

---

[14]Defendants argue that the Uniform Interstate Depositions and Discovery Act ("UIDDA") is another avenue through which Butler may be able to enforce out-of-state subpoenas.  The UIDDA's commentary states, however, that it excludes subpoenas issued by arbitrators.  "The term 'Court of Record' was chosen to exclude non-court of record proceedings from the ambit of the Act.  The committee concluded that extending the Act to such proceedings as arbitrations would be a significant expansion that might generate resistance to the Act."  Unif. Interstate Depositions & Discovery Act § 3 cmt. (Unif. L. Comm'n 2007).

At the hearing, defendants cited *Matter of Roche Molecular Systems, Inc.*, 76 N.Y.S.3d 752 (N.Y. Sup. Ct. 2018), wherein a court enforced an out-of-state subpoena from an arbitration proceeding under New York's UIDDA.  ECF No. 43 at 69:12–20.  However, that case did "not involve a subpoena issued by an arbitral tribunal, but rather, a New York subpoena properly issued pursuant to CPLR 3119 based on a commission properly issued by a California state court pursuant to Cal CCP § 1297.271."  *Matter of Roche*, 76 N.Y.S.3d at 758.

intended to allow a court in State A (the State adopting the RUAA) to give effect to a subpoena or any discovery-related order issued by an arbitrator in an arbitration proceeding in State B without the need for the party who has received the subpoena first to go to a court in State B to receive an enforceable order.").  By the Court's count, 21 states and the District of Columbia[15] have adopted this provision of the RUAA or a substantively similar one.[16]

Tellingly, Butler cites not a single case that supports his claim that he will be unable to effectively vindicate his federal statutory rights because of limits on out-of-state discovery.  That is not surprising.  After all, out-of-state discovery is limited in federal and state *courts*, yet no one argues that, because of those limitations, plaintiffs cannot effectively vindicate their federal statutory rights.  And courts have widely

---

[15]*See* Alaska Stat. § 09.43.440(g); Ariz. Rev. Stat. Ann. § 12-3017(G); Ark. Code Ann. § 16-108-217(g); Colo. Rev. Stat. § 13-22-217(7); Conn. Gen. Stat. § 52-407qq(g); D.C. Code § 16-4417(g)(1); Fla. Stat. § 682.08(7); Haw. Rev. Stat. § 658A-17(g); Kan. Stat. Ann. § 5-439(g); Mich. Comp. Laws § 691.1697(7); Minn. Stat. § 572B.17(g); Nev. Rev. Stat. § 38.233(7); N.J. Stat. Ann. § 2A:23B-17(g); N.M. Stat. Ann. § 44-7A-18(g); N.C. Gen. Stat. § 1-569.17(g); N.D. Cent. Code § 32-29.3-17(7); Okla. Stat. tit. 12, § 1868(G); Or. Rev. Stat. § 36.675(7); 42 Pa. Cons. Stat. § 7321.18(g); Utah Code Ann. § 78B-11-118(7); Wash. Rev. Code § 7.04A.170(7); W. Va. Code § 55-10-19(g).

[16]Butler cites Minn. Stat. § 572B.17(g), to argue that Minnesota courts will only enforce in-state arbitral subpoenas.  Butler is misconstruing the statute.  Section 572B.17(g) provides that if parties engaged in an arbitration *outside* of Minnesota have subpoenaed a witness *inside* of Minnesota, then Minnesota courts are empowered to enforce that subpoena.  It does not say, as Butler suggests, that an arbitrator in Minnesota cannot issue a subpoena to a witness outside of Minnesota.

-24-

rejected the contention that limits on discovery in the arbitral forum preclude the effective vindication of federal statutory rights or otherwise provide grounds not to enforce an arbitration clause.  *See, e.g.*, *Booker v. Robert Half Int'l*, 413 F.3d 77, 81–83 (D.C. Cir. 2005) (finding claim of inadequate discovery under AAA commercial arbitration rules to be too speculative to warrant non-enforcement of arbitration clause); *Robinson v. Bodily RV, Inc.*, No. 1:20-cv-00255-BLW, 2020 WL 6449170, at *4 (D. Idaho Nov. 2, 2020) (noting potential limits on ability to enforce pre-hearing subpoenas were inadequate to make arbitration clause substantively unconscionable); *Byars v. Dart Transit Co.*, 414 F. Supp. 3d 1082, 1092 (M.D. Tenn. 2019) (rejecting argument that limited discovery precluded enforcement under MRUAA); *Miyasaki v. Real Mex Rests., Inc.*, No. C 05-5331 VRW, 2006 WL 2385229, at *7 (N.D. Cal. Aug. 17, 2006) (finding AAA discovery rules for employment disputes did not impede effective vindication of federal rights); *Delta Funding Corp. v. Harris*, 396 F. Supp. 2d 512, 520–21 (D.N.J. 2004) (rejecting limited-discovery argument as a "generalized attack on arbitration").

Although the discovery available to Butler in the arbitral forum "might not be as extensive as in the federal courts, by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'"  *Gilmer*, 500 U.S. at 31 (quoting *Mitsubishi Motors*, 473 U.S. at 628) (rejecting argument that discovery limitations prevented party from vindicating

rights).  The Court therefore finds that Butler will be able to effectively vindicate his

federal statutory rights despite the limits on out-of-state discovery in the arbitral forum.

2. Ability to Pay

Butler next argues that he is unable to pay the costs of arbitration.  In his briefing,

Butler raised the issue of his ability to pay when arguing that the arbitration clauses

were unconscionable under state law.  But Butler's argument applies with equal force to

the effective-vindication issue,[17] and thus the Court will address it here.[18]

In *Green Tree*, the Supreme Court noted that "[i]t may well be that the existence

of large arbitration costs could preclude a litigant . . . from effectively vindicating [his]

federal statutory rights in the arbitral forum."  531 U.S. at 90.  The Supreme Court set

forth a burden-shifting framework for analyzing effective-vindication claims that are

grounded on a purported inability to pay the costs of arbitration:  The party seeking "to

invalidate an arbitration agreement on the ground that arbitration would be

---

[17]The Eighth Circuit has explained that federal effective-vindication claims are
distinct from state-law unconscionability claims.  *See Woodmen of World*, 479 F.3d at 566
("To the extent that *Green Tree* provides a basis for avoiding an arbitration agreement
beyond that allowed by general state contract law, Rollins has failed to meet that
standard as well."); *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 873 (8th Cir. 2004)
("Pro Tech also contends the prohibitive costs of arbitration present a hardship and are
unconscionable . . . .  In *Green Tree*, the Supreme Court addressed arbitration of federal
statutory claims, and did not analyze the unconscionability of an arbitration agreement
under state law.").

[18]At the hearing, Butler agreed that the cost argument was "more of an effective
vindication argument."  ECF No. 43 at 54:16.

prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." *Id.* at 92. If the party makes an adequate showing of prohibitive expense, then the burden shifts to "the party seeking arbitration [to] come forward with contrary evidence." *Id.*

The Eighth Circuit has clarified that the party resisting arbitration "must establish more than a 'hypothetical inability to pay' the costs of arbitration" to satisfy his burden under *Green Tree*. *Torres v. Simpatico, Inc.*, 781 F.3d 963, 969 (8th Cir. 2015) (quoting *Faber v. Menard, Inc.*, 367 F.3d 1048, 1053 (8th Cir. 2004)). In particular, the party must present "specific evidence of likely arbitrators' fees and [his] financial ability to pay those fees" to satisfy his burden. *Faber*, 367 F.3d at 1054. If the party does not meet his burden, "the district court must honor the arbitration agreement and compel arbitration." *Id.*

Butler has introduced evidence that he is currently unemployed, does not have a bank account or any money saved, and has less than $100 in cash. Butler Decl. ¶¶ 102, 108, 110. Butler points to the fee-splitting provisions in the arbitration agreements as evidence that he will have to pay part of the arbitration costs. *See* Arradizadeh Decl. Ex. 2 ¶ 28 ("The parties shall share the cost of arbitration equally."); Schaffler Decl. Ex. 3 ¶ 31(d) ("Each party shall pay its own AAA arbitration filing fees and an equal share of the fees and expenses of the arbitrator."). And Butler notes that the American

Arbitration Association ("AAA") charges initial and final filing fees of $925 and $800,

respectively, and that those fees can increase based on the amount of damages alleged.

ECF No. 38 at 36.  Finally, Butler estimates that the cost per hour of an arbitrator ranges

from $400 to $600.  Butler Decl. ¶ 99.

There are some deficiencies in Butler's declaration.  First, Butler has not indicated

how long the arbitration is likely to last, aside from stating that his "claims are complex,

and would likely require a multi-day hearing."  ECF No. 38 at 36.  "Multi-day hearing"

could mean two days or 200 days.  Butler has not pointed to the length of prior

arbitrations of similar claims or even estimated how many days he believes will be

necessary for his hearing, so the Court has no basis for determining the amount of the

"likely arbitrators' fees."  *Faber*, 367 F.3d at 1054 (finding the plaintiff's showing

inadequate when he did not provide "the evidence necessary to estimate the length of

the arbitration and the corresponding amount of arbitrators' fees (e.g. sophistication of

the issues, average daily or hourly arbitrator costs in the region)"); *see also Henderson v.*

*A & D Ints., Inc.*, No. 3:17-CV-096, 2018 WL 1240431, at *2 (S.D. Tex. Mar. 9, 2018)

("What is lacking from [the attorney's] declaration, however, is any comparison of this

case to a comparable claim that took approximately the same time to resolve.").

Second, Butler does not identify the source of his information about the hourly

fees of arbitrators, nor discuss whether the hourly fees vary based on state or region.

*See Torres*, 781 F.3d at 970 (finding fee data inadequate when it was not specific to the

geographic area in which arbitration would take place); *Delano v. Mastec, Inc.*, No. 8:10-

CV-320-T-27MAP, 2010 WL 4809081, at *6 (M.D. Fla. Nov. 18, 2010) ("Plaintiffs present

no evidence of fees charged for arbitrating similar employment disputes in central

Florida or fees charged by the arbitrator that plaintiffs would propose or request the

court to appoint." (footnote omitted)); *cf. Green Tree*, 531 U.S. at 90 n.6 (noting plaintiff's

showing was insufficient when she listed "fees incurred in cases involving other

arbitrations as reflected in opinions of other Courts of Appeals").

Even putting these problems aside, Butler's argument fails because at the

hearing, defendants agreed to pay all fees, costs, and other expenses of arbitration.  ECF

No. 43 at 78:22–79:18.  Butler will not have to pay a cent.  That eliminates any chance

that Butler will not be able to effectively vindicate his federal statutory rights because of

an inability to pay arbitration costs.[19]  *See Woodmen of World*, 479 F.3d at 566–67 (noting

employee could not meet *Green Tree* burden when employer "agreed to waive the fee-

splitting provision and pay the arbitrator's fees in full").[20]

_____

[19]Butler objected at the hearing that defendants' offer would not resolve his *Green
Tree* concerns because the offer did not extend to future plaintiffs.  But as the Fifth
Circuit explained in *Carter v. Countrywide Credit Industries, Inc.*, the inquiry under *Green
Tree* is "whether th[is] plaintiff[] will be required to pay."  362 F.3d 294, 300 n.3 (5th Cir.
2004).

[20]*See also Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 300 n.3 (5th Cir.
(continued...)

E. *Enforceability of Arbitration Clauses under Minnesota Law*

Butler asserts that the arbitration clauses are unenforceable under Minnesota

law[21] for three reasons:  the contracts were induced by fraud, the contracts are

unconscionable, and the contracts are invalid under Minn. Stat. § 181.722.  The Court

considers each argument in turn.

---

[20](...continued)

2004) (pre-litigation offer to pay costs of arbitration resolved *Green Tree* concern because "what is at issue here is whether *these* plaintiffs will be required to pay prohibitive arbitration fees and costs"); *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1029 (11th Cir. 2003) ("Given Hometown Mortgage's willingness to bear the costs of arbitration that Anders is unable to afford . . . it follows that Anders has not demonstrated that arbitration would be prohibitively expensive for him."); *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 557 (7th Cir. 2003) (offer to pay all costs of arbitration resolves *Green Tree* issue); *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 56–57 (1st Cir. 2002) (noting defendant's offer to pay costs of arbitration "mooted the issue of arbitration costs"); *Byars*, 414 F. Supp. 3d at 1092 ("Given Defendants' indication that they are willing to pay Plaintiff's share of arbitration fees and costs . . . Plaintiff's arguments about inappropriate costs are similarly speculative and potentially moot."); *Delta Funding Corp.*, 396 F. Supp. 2d at 521–23 (rejecting *Green Tree* argument based on fee-shifting provision when the party offered to pay all costs); *Nelson v. Insignia/Esg, Inc.*, 215 F. Supp. 2d 143, 157–58 (D.D.C. 2002) (rejecting *Green Tree* argument when the defendant offered to pay all costs).

[21]Although the parties dispute the applicability of the MRUAA, the parties agree that Minnesota law applies to Butler's challenges to the validity of the arbitration agreements.

1.  Fraudulent Inducement

*a.  Arbitrability*[22]

Butler argues that the agreements (including the arbitration clauses) are invalid

because they were induced by fraud.  *See Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 353

n.7 (Minn. 2003) ("[A] flaw in the formation of the contract also taints and terminates

the arbitration clause.").  Under Minnesota law, however, "[p]arties may validly choose

to arbitrate all controversies, including fraud in the inducement." *Michael-Curry Cos.,*

*Inc. v. Knutson S'holders Liquidating Tr.*, 449 N.W.2d 139, 141 (Minn. 1989).  Before

addressing the merits of Butler's fraudulent-inducement claim, then, the Court must

first determine whether the parties agreed to arbitrate that claim.

Under Minnesota law, a court may not find that the parties to a contract agreed

to arbitrate the question of whether the contract was induced by fraud unless the

contract's arbitration clause is either very specific or very broad.  In other words, the

language of the arbitration clause "must either (1) specifically show that the parties

intended to arbitrate fraud in the inducement, or (2) be 'sufficiently broad to

comprehend that the issue of fraudulent inducement be arbitrated.'" *Id.* (quoting *Atcas*

*v. Credit Clearing Corp. of Am.*, 197 N.W.2d 448, 456 (Minn. 1972), *overruled in part on other*

---

[22]In their reply brief, defendants did not discuss the arbitrability of Butler's
fraudulent-inducement defense, but at the hearing they argued that the issue must be
arbitrated.  ECF No. 43 at 71:4–13.

*grounds by Onvoy*, 669 N.W.2d at 351); *see also Stahl v. McGenty*, 486 N.W.2d 157, 158–59

(Minn. Ct. App. 1992) (noting there is an exception "to the preference for arbitration

when a party seeks to rescind a fraudulently induced contract").

      As noted, this case involves two arbitration clauses—one in the ICOA and one in

the lease.  In relevant part, the arbitration clause in the ICOA provides:  "Any dispute

arising out of or relating to this Agreement . . . shall be fully and finally resolved by

arbitration in accordance with the commercial arbitration rules of the American

Arbitration Association ('AAA')."  Arradizadeh Decl. Ex. 2 ¶ 28.  In relevant part, the

arbitration clause in the lease provides:  "To the extent any disputes . . . arise in

connection with or relate to this Agreement, including any allegation of a tort . . . Lessor

and Lessee agree to submit such disputes to final and binding arbitration," and "[t]he

parties intend the arbitrator to decide all issues, including those relating to the scope of

this Section, to the maximum extent permitted by law."  Schaffler Decl. Ex. 3 ¶ 31(a)–(b).

      These arbitration clauses are neither sufficiently specific nor sufficiently broad to

encompass a claim of fraud in the inducement.  On the one hand, "*Atcas* and

subsequent Minnesota state court cases require[] that the contractual language be *very*

specific in specifying that a claim of fraud in the inducement be subject to arbitration if

that claim is to be arbitrable."  *Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d

936, 945 (8th Cir. 1990).  The arbitration clauses in the ICOA and the lease do not even

mention claims of fraud in the inducement.  On the other hand, the references in the

arbitration clauses to "[a]ny dispute arising out of or relating to this Agreement" and

"any disputes . . . aris[ing] in connection with or relat[ing] to this Agreement, including

any allegation of a tort" are not, under Minnesota law, broad enough to encompass a

claim of fraudulent inducement, because such a claim relates to conduct that occurs

before the contract was allegedly formed.[23]  *See Atcas*, 197 N.W.2d at 451, 456 ("[a]ny

---

[23]Defendants cite *Churchill Environmental & Industrial Equity Partners, L.P. v. Ernst & Young, L.L.P.*, 643 N.W.2d 333 (Minn. Ct. App. 2002), to support their contention that the parties agreed to arbitrate all claims, including fraudulent-inducement claims.  In *Churchill*, however, the plaintiff did not contest the validity of the contract; instead, it simply argued that its claims arose out of services that were not within the scope of the arbitration clause.  In other words, the plaintiff raised a straightforward issue of contractual interpretation, not a challenge to the very existence of the contract.  The court held that, under the contract's delegation clause, the arbitrator was charged with deciding whether plaintiff's claims fell within the scope of the arbitration clause.  *Id.* at 337.  Here, by contrast, Butler is arguing that the contracts are invalid on account of fraudulent inducement.  The rule of *Atcas* therefore applies; in other words, Butler's fraudulent-inducement claim is not arbitrable unless its arbitrability is made clear by language that is very specific or very broad.

At the hearing, defendants argued that the use of the word "tort" in the lease's arbitration clause is broad enough to cover Butler's fraudulent-inducement claim.  The Minnesota Court of Appeals rejected a similar argument in *Heyer v. Moldenhauer*, 538 N.W.2d 714 (Minn. Ct. App. 1995).  The court interpreted an agreement to arbitrate "any claim . . . arising out of or relating to the physical condition of the property covered by this purchase agreement (including without limitation claims of fraud[).]"  *Id.* at 716.  The court concluded that "fraud" modified "arising out of or relating to the physical condition of the property" and did not cover contract-formation issues, such as fraudulent inducement.  *Id.* at 717.  Here, the word "tort" refers to types of disputes that "arise in connection with or relate to" the lease, Schaffler Decl. Ex. 3 ¶ 31(a), and under Minnesota case law, a claim of fraudulent inducement is not deemed to "arise in

(continued...)

controversy whatsoever, relating to this Agreement" did not cover fraud in the inducement); *C.J. Duffey Paper Co. v. Reger*, No. C6-95-2209, 1996 WL 146741, at *1–2 (Minn. Ct. App. Apr. 2, 1996) ("any controversy or claim arising out of or relating to this agreement" did not cover fraud in the inducement); *NCR Credit Corp. v. Park Rapids Leasing Assocs.*, 349 N.W.2d 867, 868 (Minn. Ct. App. 1984) ("[a]ny controversy or claim, including any claim of misrepresentation, arising out of or related to this Agreement" did not cover fraud in the inducement); *cf. Michael-Curry Cos.*, 449 N.W.2d at 142 ("[a]ny controversy or claim arising out of, or relating to, this Agreement, or the making, performance or interpretation thereof" covered fraud in the inducement because of the inclusion of the word "making").

In addition, Minnesota law requires that a plaintiff who is resisting arbitration on grounds of fraudulent inducement must be seeking to rescind the contract rather than seeking damages on account of the fraud.  *Atcas*, 197 N.W.2d at 456 ("[F]raudulent inducement will not be arbitrated where the party asserting the fraud seeks to rescind the contract containing the arbitration clause, but will be arbitrated where the party seeks not rescission but damages for the loss caused him by the fraud."); *Stahl*, 486

---

[23](...continued)
connection with or relate to" a contract because it is based on conduct that occurred before the contract came into existence.

N.W.2d at 159.  That is true here, as Butler seeks to rescind his agreements with

defendants.[24]  *See* Am. Compl. ¶¶ 305–17.

For these reasons, the Court finds that the parties did not agree to arbitrate a

claim of fraud in the inducement.  Therefore, this Court—and not an arbitrator—must

address the merits of Butler's claim.  The Court now turns to that claim.

*b.  Butler's Fraud Allegations*

"A claim for fraud in the inducement is only different from a common-law fraud

claim in that it requires a claim that the fraud contributed to the formation of a

contract."  *AmeriCU Mortg. Co. v. Frazier*, No. 12-CV-3118 (MJD/SER), 2013 WL 6036702,

at *4 (D. Minn. Nov. 14, 2013) (quotations and citation omitted).  To succeed on his

fraudulent-inducement claim, Butler must demonstrate the following five elements:

> (1) there was a false representation by a party of a past or
> existing material fact susceptible of knowledge; (2) made
> with knowledge of the falsity of the representation or made
> as of the party's own knowledge without knowing whether
> it was true or false; (3) with the intention to induce another
> to act in reliance thereon; (4) that the representation caused
> the other party to act in reliance thereon; and (5) that the
> party suffer[ed] pecuniary damage as a result of the reliance.

---

[24]That Butler seeks damages under federal statutes and under equitable
principles does not mean that he is ratifying the contract, which was *Atcas*'s concern.
*Cf. C.J. Duffey Paper Co.*, 1996 WL 146741, at *2 (allowing a plaintiff to seek rescission of
contract, or in the alternative, damages).

*Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (quoting

*Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)); *see also Valspar*

*Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

In addition, "[r]eliance in common law fraud cases must be reasonable." *Teng*

*Moua v. Jani-King of Minn., Inc.*, 810 F. Supp. 2d 882, 890 (D. Minn. 2011) (citing *Hoyt*

*Props.*, 736 N.W.2d at 321). Courts evaluate reliance "in the context of the aggrieved

party's intelligence, expertise, and opportunity to investigate the facts at issue." *Valspar*

*Refinish, Inc.*, 764 N.W.2d at 369.

In his written declaration, Butler identifies numerous allegedly fraudulent

statements on which he purportedly relied—statements that were made either in the

advertisement to which he responded or by the recruiter to whom he spoke.[25]  Butler

Decl. ¶ 11 ("I relied on the representations made by Defendants in paragraphs 5–8 in

deciding to become a Lease Purchase Driver for Defendants.").  At the hearing,

---

[25]Defendants argue that Butler's fraud claims are foreclosed by disclaimers in the agreements providing that the contracts supersede all prior conversations. *See* Arradizadeh Decl. Ex. 2 ¶ 24; Schaffler Decl. Ex. 3 ¶ 30.  But the inclusion of such a general disclaimer in a contract is not sufficient—in and of itself—to defeat a claim that the contract was fraudulently induced.  "The only situation in which the Minnesota courts have held that a contract provision negatives a claim of fraud is where the provision explicitly states a fact completely antithetical to the claimed misrepresentations." *Clements Auto Co. v. Serv. Bureau Corp.*, 444 F.2d 169, 179 (8th Cir. 1971); *see also Randall v. Lady of Am. Franchise Corp.*, 532 F. Supp. 2d 1071, 1100 (D. Minn. 2007) ("Minnesota courts (and federal courts applying Minnesota law) have held on many occasions that contractual disclaimers do not, as a matter of law, relieve those accused of fraud of liability.").

however, Butler went further and argued that each fraudulent statement that he

identified is actually two fraudulent statements:  the first a forward-looking

representation about how the program would work for him and the second an implicit

backward-looking representation about how the program has worked for other drivers

in the past.  ECF No. 43 at 32:5–12.  The Court considers each statement in turn.

i.  $2,500 Sign-On Bonus

The first allegedly fraudulent statement cited by Butler is the advertisement's

promise that he would be paid a $2,500 sign-on bonus.  Butler Decl. ¶ 5.[26]  At the

hearing, Butler's attorney argued that Butler never received that sign-on bonus.  ECF

No. 43 at 38:1–11.  But nowhere in Butler's declaration[27] does Butler himself claim that

he was not paid the advertised sign-on bonus—or that, in the past, ATS has failed to

pay promised sign-on bonuses.  There is simply no evidence in the record that ATS

made a false representation about the sign-on bonus to Butler or anyone else.

---

[26]Although the parties dispute the exact contents of the advertisement, the Court
accepts Butler's description of the advertisement as true for the purposes of evaluating
his fraudulent-inducement claim.

[27]As discussed above, the Court is applying the standards that normally apply to
summary-judgment motions.  Thus, to defeat defendants' motion to compel arbitration,
Butler is "required to offer evidence countering defendants' supporting affidavits and
other evidence."  *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (per curiam).
The arguments of counsel are not evidence, and Butler's complaint is also not evidence
because it was not verified under oath.  *Id.*

ii. $4,000 Lease-Completion Bonus

Butler next claims that the advertisement fraudulently promised that he would receive a $4,000 lease-completion bonus. Butler Decl. ¶ 5. Butler concedes that he *received* this bonus, but he objects to the fact that only about $1,000 was paid in cash, while the remaining $3,000 was applied to a debt that he owed to defendants. Butler Decl. ¶¶ 96–97. ATS's records show that Butler received two checks that together comprised his lease-completion bonus—one for $967.20 (which Butler kept) and a second for $3,032.80 (which Butler endorsed to Competitive). Schaffler Decl. ¶ 13 & Ex. 4.

Butler's fraud claim is difficult to understand. Butler appears to be arguing that the advertisement promised not just that ATS would pay him a $4,000 lease-completion bonus, but that ATS would not require him to use any portion of that bonus to repay debts that he owed to ATS. It seems highly unlikely that a craigslist.com job advertisement would go into this level of detail about a lease-completion bonus. But even accepting Butler's assertion as true, his fraud claim is foreclosed by the text of the lease itself. Attachment 6 to the lease provides that if the lessee's balance in his reserve account is less than $1,000 when the lease is completed, "Lessee Fulfillment Bonus monies shall be transferred to the General Reserve Account and shall be available for disbursement per the terms of the lease." Schaffler Decl. Ex. 3, Attach. 6. In Butler's

case, he had a negative balance in his General Reserve Account, and thus part of his lease-completion bonus was used to pay off his debt, exactly as the lease said it would. *Id.* ¶ 13 & Ex. 4.

This provision in the lease "squarely contradict[s]" any implication in the craigslist.com advertisement that the lease-completion bonus would be provided to drivers free and clear, and therefore Butler cannot meet the reliance element of his fraud claim. *Comm. Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 875 (8th Cir. 1991) (noting contract provision can defeat reliance element when "squarely contradicted by the written disclaimers"); *see also Crowell v. Campbell Soup Co.*, 264 F.3d 756, 762 (8th Cir. 2001) (noting reliance is unreasonable when statements were "completely contradicted by the terms of the written contract").[28]  Butler has also not submitted any evidence that defendants failed to pay a promised lease-completion bonus in the past.  Butler therefore does not have a viable fraud claim arising out of the representation about the $4,000 lease-completion bonus.

---

[28]Butler also takes issue with the fact that the advertisement implied that the lease-completion bonus came from ATS, when it actually came from Competitive.  ECF No. 38 at 26.  Any fraud claim based on this aspect of the advertisement is foreclosed by the lease itself, which makes clear that Competitive pays the bonus.  *See* Schaffler Decl. Ex. 3, Attach. 6 (describing process for lease-completion bonus and is signed by Butler and a Competitive leasing manager).  Moreover, Butler has not introduced any evidence that the source of the bonus money was material or that he acted in reliance on the assertion that his bonus would come from ATS instead of Competitive.

iii.  Drivers Could Earn $2,500 Weekly

Butler next claims that the advertisement fraudulently represented that drivers

could earn $2,500 per week.[29]  Butler Decl. ¶ 5.  This statement was not fraudulent for at

least two reasons:

First, Butler has not introduced any evidence that this statement is actually false.

According to Butler, the advertisement promised him that drivers "*could* earn

approximately $2,500 weekly."  *Id.* (emphasis added).  But Butler has not submitted any

evidence that this is *untrue*—neither evidence that he could not earn this amount, nor

evidence that, in the past, other drivers could not earn this amount.  By contrast, ATS

has introduced evidence that all of the assertions about income in its advertisements are

based on actual earnings.  *See* Goering Decl. ¶ 2.

Second, this statement is too vague to support a fraud claim, as the word "earn"

can reasonably be understood to refer to either gross earnings or net earnings.  *See*

*Bubble Pony, Inc. v. Facepunch Studios Ltd.*, No. 15-CV-601(DSD/FLN), 2015 WL 8082708,

at *4 (D. Minn. Dec. 7, 2015) (finding open-ended discussions about potential future

work too vague to be material representations of fact).  Indeed, "earn" is probably more

commonly understood to refer to gross earnings than to net earnings.  When someone

---

[29]The complaint also mentions that as of September 2020 ATS has advertised that
the top 10% of drivers earn $250,000 annually.  Am. Compl. ¶ 55.  Butler obviously did
not rely on this representation, though, as he signed the agreements in 2017 and 2018.

asks (or Googles) a question such as "how much does the President of the United States earn?" or "how much does an airline pilot earn?," the answer will almost invariably refer to gross earnings.

Again, there is no evidence that Butler or any other driver "could not" achieve gross earnings of at least $2,500 per week.  To the contrary, the undisputed evidence is that Butler's weekly gross earnings averaged $2,757.02—and, if weeks during which Butler did not work are excluded, his gross earnings actually averaged $3,363.  *See* Dwyer Decl. ¶ 5 & Exs. 2, 3; ECF No. 34 at 25.  For these reasons, Butler's fraud claim fails insofar as it relies on a promise that drivers "could earn approximately $2,500 weekly."

### iv.  Good Cash

Butler next claims that the ATS recruiter committed fraud when he told Butler that "all drivers make 'good cash.'"  Butler Decl. ¶ 6.  This statement is obvious puffery that "cannot form the basis of a fraud claim."  *Teng Moua*, 810 F. Supp. 2d at 890. "Puffery includes exaggerated blustering or boasting and vague, subjective statements of superiority."  *Bernstein v. Extendicare Health Servs., Inc.*, 607 F. Supp. 2d 1027, 1031 (D. Minn. 2009).  The statement that drivers make "good cash" working for ATS is exactly the sort of vague statement of superiority that courts reject as insufficient to

sustain a fraud claim.  *See Teng Moua*, 810 F. Supp. 2d at 890 (finding statement that

owning a franchise was "good business" was puffery).

v.  No Zero Pay Weeks

Butler next claims that the recruiter fraudulently represented that he "would not

experience any 'zero pay' weeks."  Butler Decl. ¶ 6.  To prove that this statement was

false, Butler points to one week during which he drove and yet did not receive any *net*

pay.  *See* Dwyer Decl. Ex. 2 (showing the week of February 14, 2018 as one such zero

pay week).  Butler's fraud claim fails for at least two reasons:

First, the "zero pay" statement was a promise about future events.  Under

Minnesota law, "a representation of expectation as to future acts or events is not a

sufficient ground for the charge of fraud merely because the represented act or event

did not take place."  *Cady v. Bush*, 166 N.W.2d 358, 361 (Minn. 1969); *see also Minn. Forest

Prods., Inc. v. Ligna Mach., Inc.*, 17 F. Supp. 2d 892, 909 (D. Minn. 1998) (collecting

Minnesota cases).  Instead, "[f]or a promise to be fraudulent, the person making the

promise must, at the time the promise is made, not intend to fulfill the promise."

*Stumm v. BAC Home Loans Servicing, LP*, 914 F. Supp. 2d 1009, 1014 (D. Minn. 2012).

Butler has introduced no evidence that, when defendants promised that he would not

experience any "zero pay" weeks, they had no intention of fulfilling that promise.  Nor

-42-

has Butler introduced any evidence that any defendant made a "zero pay" promise to another driver without intending to keep that promise.

Second, like the word "earn," the word "pay" is ambiguous, as it could reasonably be understood to refer to either gross pay or net pay. Because "pay" can reasonably be interpreted as referring to gross pay, and because Butler does not claim that he (or any other driver) ever had a "zero *gross* pay" week, his fraud claim fails.

vi.  Keep Him Moving

Butler next claims that the recruiter fraudulently told him that ATS "would keep [him] moving," meaning "loaded and/or under dispatch." Butler Decl. ¶ 6. This claim fails for at least four reasons: First, Butler does not identify what about this statement was false. Second, this statement is too vague to be material. *See Twaiten v. Murphy*, No. A10-256, 2010 WL 3220149, at *3 (Minn. Ct. App. Aug. 17, 2010). Third, Butler has no evidence that, whatever this statement means, defendants did not intend to fulfill their promise when it was made. And fourth, insofar as Butler asserts that this statement promised him (or another driver) a minimum level of work, the statement is directly refuted by the ICOA, which provides: "WE are not obligated to provide YOU a minimum volume of freight and YOU are not obligated to accept each shipment tendered by US." Arradizadeh Decl. Ex. 2 ¶ 2A; *see Crowell*, 264 F.3d at 762 (reliance on promise that "plainly contradicted the terms of the written contract" is unreasonable).

-43-

vii.  Continue the Lease

Butler next claims that the recruiter fraudulently told Butler that, after one year,

Butler could choose to renew the lease on his original truck or walk away.  Butler Decl.

¶ 6.  Butler declares that this statement was false because in May 2018—after the

mileage on his truck exceeded 450,000 miles—Competitive told Butler that it was selling

his truck and that, if he wanted to continue in the program, he would have to lease a

different truck.  *Id.* ¶¶ 90–91.

A reasonable jury could not find this statement to be a fraudulent

misrepresentation for two reasons.  First, this is another promise as to future events,

and Butler has no evidence that when this promise was made to him (or when a similar

promise was made to another driver) defendants did not intend to keep their promise.

*See Kramer v. Bruns*, 396 N.W.2d 627, 631 (Minn. Ct. App. 1986) ("A misrepresentation

does not constitute fraud unless affirmative evidence indicates that the promisor did

not intend to perform at the time he or she made the promise.").  Second, Butler has not

shown that this was a misrepresentation of *material* fact, because he has not introduced

any evidence that having the ability to renew the lease on the *particular* truck was a

significant reason why he (or any other driver) agreed to the ICOA and the lease in the

first place.  *See Berryman v. Riegert*, 175 N.W.2d 438, 433 (Minn. 1970) (noting the

misrepresentations must "substantially and materially" have induced the plaintiff to act

-44-

to sustain fraud claim).  This would be a difficult claim for Butler to make, given that he insists that he signed the ICOA and the lease before he even knew which truck would be assigned to him.

### viii.  Lease-Completion Bonus

Butler next claims that the recruiter fraudulently represented that he would receive a lease-completion bonus following "one year of service."  Butler Decl. ¶ 6.  Of course, Butler *did* receive a lease-completion bonus following one year of service.  According to Butler, however, the statement was nevertheless false because he would not have received the lease-completion bonus if he had not signed a new ICOA and a new lease.  *Id.* ¶ 93.  Once again, Butler's fraud claim is not viable.

As an initial matter, Butler does not claim that the promise made by the recruiter was unconditional.[30]  *Cf. Teng Moua*, 810 F. Supp. 2d at 902 (finding when the defendant never promised the plaintiff that he would receive only evening accounts, "[defendant] is not responsible for [plaintiff's] subjective belief that he would receive only evening accounts").  And even if the recruiter had made an unconditional promise, that promise would have been directly refuted by Attachment 6 to the lease, which identifies several conditions that must be met before the bonus is paid.  Schaffler Decl. Ex. 3, Attach. 6.  One of those conditions is that the "Lessee shall have entered into one or more

---

[30]Butler's brief argues that the lease-completion bonus was presented as unconditional, but Butler's declaration does not say that.

consecutive Lease(s), including this Lease, with term(s) as approved by Lessor." *Id.*

A lease cannot be "consecutive" unless it follows at least one other lease. Because the

terms of the lease directly refute any statement by the recruiter that the bonus was

unconditional, the recruiter's statement is not actionable. *See Crowell*, 264 F.3d at 762.

In addition, Butler has not shown that the allegedly unconditional nature of the

lease-fulfillment bonus "substantially and materially" induced him to act. *See Berryman*,

175 N.W.2d at 433. In other words, Butler has not submitted evidence (or even claimed)

that, had he known that he would have to sign a second lease in order to receive a

bonus for completing the first lease, he would not have joined the program.

### ix. Home Time

Butler next claims that the recruiter fraudulently told Butler that he could receive

"home time" whenever he wanted. Butler Decl. ¶ 6. There is zero evidence that this

statement was false—when made to Butler or anyone else. To the contrary, the

statement appears to be confirmed by the terms of the ICOA. *See* Arradizadeh Decl.

Ex. 2 ¶ 2A ("YOU are not obligated to accept each shipment tendered by US.").

### x. Free Flight and Hotel

Finally, Butler claims that the recruiter committed fraud by offering him a "free

flight" to Minnesota and a "free hotel" so that he could attend the orientation. This is

yet another puzzling claim, as ATS provided Butler with exactly what was promised: a

-46-

free flight to Minnesota and a free hotel.  Butler argues that the recruiter nevertheless

committed fraud by not telling Butler whether ATS would pay for his return trip home

if he chose not to join the lease-purchase program.  Butler Decl. ¶¶ 7–8, 22.

The recruiter did not commit fraud by saying *nothing*—one way or the

other—about whether ATS would pay Butler's return transportation costs.  Butler does

not claim that he asked defendants about return transit and they lied to him; he just

says that "[a]t no point did Defendants advise [him] that [he] would be provided with a

way to return home if [he] chose not to join Defendants' Lease Purchase program."  *Id.*

¶ 8.  This is not fraud.  (And for what it's worth, the evidence is undisputed that ATS

provides a bus ticket or funds to rent a car to individuals who do not sign onto the

program.  *See* Goering Decl. ¶¶ 11, 20.)

In sum, based on the evidence in the record, a reasonable jury could not find that

defendants made a single fraudulent statement to Butler to induce him to enter the

lease-purchase program.  Accordingly, the Court rejects Butler's contention that the

agreements that he signed are void because they were fraudulently induced.

### 2.  Unconscionability

Butler next argues that the contracts that he signed—and the arbitration clauses

within those contracts—are unconscionable.  Butler's unconscionability claims are

contract-formation arguments that primarily focus on pre-contract behavior.  Therefore,

for the same reasons that the Court concluded that the parties did not agree to arbitrate

the issue of fraudulent inducement, the Court also concludes that the parties did not

agree to arbitrate the issue of unconscionability.  The Court therefore turns to the

substance of Butler's claims.

"A contract is unconscionable if it is such as no man in his senses and not under

delusion would make on the one hand, and no honest and fair man would accept on the

other."  *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 702 (Minn. Ct. App.

1989) (quotations and citation omitted).  "Unconscionability has two aspects, procedural

and substantive," and Butler must establish both aspects to prevail.  *RJM Sales & Mktg.,*

*Inc. v. Banfi Prods. Corp.*, 546 F. Supp. 1368, 1375 (D. Minn. 1982); *see also Kiefer v.*

*Simonton Bldg. Prods., LLC*, No. 16-CV-3540 (RHK/SER), 2017 WL 1380497, at *3

(D. Minn. Apr. 17, 2017), *appeal dismissed*, No. 17-2095 (8th Cir. Aug. 2, 2018).

Substantive unconscionability arises when "the terms of the contract itself are

unreasonably favorable" to defendants, and procedural unconscionability arises if

Butler "had no meaningful choice but to accept the contract."  *Meeks v. Pioneer Energy*

*Servs.*, No. 14-CV-0412 (ADM/JJG), 2014 WL 12601075, at *2 (D. Minn. June 3, 2014).

"If a court determines that a contract contains an unconscionable clause, it may

refuse to enforce the contract, enforce it without the offending language, or limit

application of the unconscionable clause 'to avoid any unconscionable result.'"

*Kauffman Stewart, Inc. v. Weinbrenner Shoe Co.*, 589 N.W.2d 499, 502 (Minn. Ct. App. 1999) (quoting Restatement (Second) of Contracts § 208 (Am. L. Inst. 1981)).

The Court will first address the contracts as a whole and then address the arbitration clauses.

### a.  The Contracts

### i.  Procedural Unconscionability

Butler argues that the ICOA and the lease are procedurally unconscionable for several reasons.  To begin, Butler claims that both agreements were contracts of adhesion presented on a take-it-or-leave-it basis.  But *most* contracts in the modern world are presented on a take-it-or-leave-it basis; a customer does not do a lot of bargaining when buying a hamburger from McDonalds, renting a car from Avis, or purchasing music on iTunes.  The fact that a contract is presented on a take-it-or-leave-it basis does not make it an unenforceable adhesion contract.

Rather, to establish that the contracts are unenforceable adhesion contracts, Butler "must show (1) a great disparity in bargaining power with no opportunity for negotiation; and (2) that the services offered by defendants are a public necessity and cannot be obtained elsewhere."  *Siebert v. Amateur Athletic Union*, 422 F. Supp. 2d 1033, 1040 (D. Minn. 2006) (citing *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 924–25 (Minn. 1982)); *see also Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.*, 646 N.W.2d 904, 909–10

(Minn. Ct. App. 2002) (noting boilerplate language, "parties' sophistication, bargaining-power disparity, opportunity for negotiation, opportunity to obtain the product elsewhere, and the product's status as a public necessity" as relevant factors for determining if a contract is an unenforceable adhesion contract).  Because most people are capable of performing many jobs, "[e]mployment contracts do not fit easily into this understanding of contracts of adhesion."  *Gooden v. Village Green Mgmt. Co.*, No. Civ.02-835 (JRT/SRN), 2002 WL 31557689, at *3 (D. Minn. Nov. 15, 2002).

The Court will assume that Butler has satisfied the first element—a bargaining disparity between the parties—but this alone is "insufficient to void these contracts." *Kiefer*, 2017 WL 1380497, at *3; *see also Webb v. R. Rowland & Co.*, 800 F.2d 803, 807 (8th Cir. 1986) ("The use of a standard form contract between two parties of admittedly unequal bargaining power does not invalidate an otherwise valid contractual provision.").  Again, the vast majority of contracts reached in the modern world are reached between parties who do not have equal bargaining power.  Those contracts are not all void.

Butler clearly cannot meet the second element.  *See Schlobohm*, 326 N.W.2d at 925 (requiring a showing that the "services were necessary or that the services could not have been obtained elsewhere").  Butler has not shown that ATS "provide[s] services of public necessity" or that he "was unable to obtain employment with another company

providing similar services." *Byars*, 414 F. Supp. 3d at 1093 (applying Minnesota law);
*see also Heath v. Travelers Cos.*, No. CIV.08-6055(JRT/JJG), 2009 WL 1921661, at *6 (D.
Minn. July 1, 2009) (finding no adhesion contract despite superior bargaining power
and unilateral drafting by the defendant when the plaintiff's employment was not a
necessary public service, he could have found employment elsewhere, he had time to
review the policy, and he did not attempt to negotiate the terms of the policy); *Lindsley
v. DaimlerChrysler Fin. Servs. Ams. LLC*, No. 08-CV-1466 (DWF/SRN), 2009 WL 383616,
at *2 (D. Minn. Feb. 11, 2009) (finding no adhesion contract when the plaintiff had not
demonstrated that financing a car was a public necessity or that she could not have
obtained financing elsewhere).

There are thousands of trucking companies, and defendants are not the only
companies that will offer Butler a job as a truck driver.  In fact, Butler previously
worked as a trucker for a different company.  Goering Decl. Ex. 5 (listing Butler's past
trucking jobs); *cf. Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115,
130 (Minn. Ct. App. 2017) ("The service TMS offered . . . was available elsewhere
because Staffing had worked with another company providing similar services.").  It
also bears noting that if Butler did not like the terms of the independent-contractor
program, he had the option to work for ATS as an employee.  Arradizadeh Decl. ¶ 2.
Clearly, then, the agreements were not procedurally unconscionable.

Butler also alleges that the contracts were not provided on paper, that he did not have adequate time to read them, and that he had to sign the contracts before selecting his truck. But Butler does not declare that he *asked* to see the contracts before traveling to Minnesota, or that he *asked* for paper copies of the contracts at orientation, or that he *asked* for additional time to consider the agreements, or that he *asked* for time to consult with an attorney. And thus Butler has submitted nothing that contradicts defendant's evidence that all of these requests would have been honored if he had simply made them. Arradizadeh Decl. ¶ 3; Schaffler Decl. ¶¶ 4–5; *see Plummer v. McSweeney*, 941 F.3d 341, 348 (8th Cir. 2019) (applying D.C. law and rejecting claim that plaintiff's failure to read the agreement and the fact that it was sent electronically made it procedurally unconscionable).

### ii.  Substantive Unconscionability

Butler's substantive unconscionability arguments are similarly unavailing. Again opting for quantity of argument over quality, Butler takes issue with numerous aspects of the agreements, such as the indemnity clauses; the lease's acceleration clause; the fact that he was required to work exclusively for ATS, but ATS was not required to provide him with a minimum amount of freight; ATS's right to take deductions from his earnings; the requirement that he fund escrow accounts; the fact that settlements

become final after 30 days; the requirement that he pay operating expenses; and the way that he was charged for tires.

Butler cites no case law in support of his argument that these contractual terms are substantively unconscionable. He simply picks through the contracts and lists the terms that he does not like. But anyone can do that with respect to any contract; the very nature of a contract is that it provides duties and benefits to both parties. "Where both parties obtained real and tangible benefits from the execution of a contract, [Minnesota courts] generally conclude that a contract is not unconscionable." *K&S Heating, Air Conditioning & Plumbing, LLC v. Kramer*, No. A16-1505, 2017 WL 2224390, at *5 (Minn. Ct. App. May 22, 2017) (quotations, alterations, and citation omitted). There is no doubt that Butler obtained "real and tangible benefits" from his contracts; after all, he grossed $163,731 and netted $15,238 under the contracts in 2018. Butler Decl. ¶¶ 106–07. His substantive-unconscionability argument thus fails.

Finally, even if Butler is correct that certain of these provisions are substantively unconscionable, he must show *both* substantive *and* procedural unconscionability to invalidate the ICOA and the lease—and, for the reasons describe above, he has failed to show procedural unconscionability. *See RJM Sales & Mktg*, 546 F. Supp. at 1375 (both substantive and procedural unconscionability required). The Court therefore rejects Butler's argument that the contracts as a whole are unconscionable.

*b.  The Arbitration Clauses*

Butler also argues that even if the entire contracts are not unconscionable, the arbitration clauses within those contracts are unconscionable.

Butler runs into an immediate problem.  As just noted, to invalidate the arbitration clauses, Butler must show both substantive and procedural unconscionability.  Butler contends that the arbitration clauses are "procedurally unconscionable for the same reasons that the larger contracts are."  ECF No. 38 at 33.  But the Court has found that the "larger contracts" are not procedurally unconscionable.  That disposes of Butler's challenge to the arbitration clauses.

Butler also cannot prove that the arbitration clauses are substantively unconscionable.  Butler argues that the arbitration clauses are substantively unconscionable for three reasons:

First, Butler points out that the arbitration clauses are not mutual.[31]  But Minnesota law "does not require mutuality of obligation so long as the contract itself is supported by consideration."  *Broadribb v. Globe Airport Sec. Servs., Inc.*, No. Civ.031187 (RHK/JSM), 2003 WL 22136071, at *3 n.1 (D. Minn. Sept. 15, 2003); *see also Cardinal*

---

[31]The ICOA provides that "WE may forego arbitration and pursue litigation against YOU to recover OUR property or any monies that are owed to US by YOU under this Agreement."  Arradizadeh Decl. Ex. 2 ¶ 28.  The lease states that "Lessor may, at its sole discretion, pursue a civil lawsuit against Lessee in order to recover any property or equipment belonging to Lessor, and to seek damages related to Lessee's failure to timely return such property or equipment."  Schaffler Decl. Ex. 3 ¶ 31(f).

*Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 266 (Minn. 1980) ("The concept of

mutuality has been widely discredited in contract law, and it is now generally

recognized that the obligations of the parties need not be substantially equal for there to

be a binding contract.").[32]  There is no doubt that the contracts are supported by

consideration.

Second, Butler takes issue with the limitations periods provided in the

agreements.  The ICOA requires a demand for arbitration to be made within one year,

and the lease requires a demand for arbitration to be made within two years.

Arradizadeh Decl. Ex. 2 ¶ 28; Schaffler Decl. Ex. 3 ¶ 31(b).  Minnesota courts will

enforce contractual limitations periods that vary from statutory limitations periods

provided that "there is no statute specifically prohibiting the use of a different

limitations period in such a case and the time fixed is not unreasonable."  *Peggy Rose*

---

[32]Butler cites *Schmidt v. Midwest Family Mutual Insurance Co.*, 413 N.W.2d 178
(Minn. Ct. App. 1987), *aff'd*, 426 N.W.2d 870 (Minn. 1988), to argue that non-mutual
arbitration clauses cannot be enforced.  In that case, the court found a trial de novo
provision in an arbitration clause unenforceable for several reasons, including that the
provision favored the insurer.  The court's holding was restricted to the trial de novo
provision—the court did not address any other aspect of the arbitration clause—and
was based only in part on concerns about the lack of mutuality.  Minnesota law has
been clear for many years that a lack of mutuality does not render a contract term
unenforceable.  To the extent that *Schmidt* is inconsistent with that law, it is an outlier,
and the Court declines to follow it.

Butler also cites *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159,
171 (5th Cir. 2004), and *Kinney v. United HealthCare Servs., Inc.*, 83 Cal. Rptr. 2d 348, 354
(Cal. Ct. App. 1999).  Neither case applies Minnesota law, however.

*Revocable Tr. v. Eppich*, 640 N.W.2d 601, 606 (Minn. 2002). The Court is unaware of any statute that "specifically prohibit[s]" the limitations periods provided in the ICOA and the lease, and those limitations periods are clearly reasonable. *See Davies v. Waterstone Cap. Mgmt., L.P.*, 856 N.W.2d 711, 719 (Minn. Ct. App. 2014) (enforcing contract's 90-day limitation).[33] The Court therefore holds that the limitations periods do not render the arbitration clauses unconscionable.[34]

Finally, Butler argues that the fee-splitting provisions are unconscionable. Although the Court has rejected Butler's *Green Tree* claim based on the fee-splitting provisions, the Court finds Butler's unconscionability claim to present a closer question. The Court will assume that the fee-splitting provisions are unconscionable, but that does not mean that defendants' motion to compel arbitration must be denied, as the

---

[33]Some courts considering contractual provisions that shorten the FLSA statute of limitations have found those provisions to be "contrary to the FLSA and unenforceable." *Hackler v. R.T. Moore Co.*, No. 2:17-cv-262-FtM-29MRM, 2017 WL 6535856, at *4 (M.D. Fla. Dec. 21, 2017) (collecting cases). But defendants have not attempted to enforce the contracts' modifications of the statute of limitations as to Butler's FLSA claims. If defendants did attempt to enforce a shortened limitations period for Butler's FLSA claims, the Court could sever the statute-of-limitation provisions in the arbitration clauses, particularly given that the agreements contain savings clauses.

[34]The Court also notes that defendants have not attempted to enforce these limitations periods in this case, *see* ECF No. 34 at 31, which provides another basis for the Court's decision not to invalidate the arbitration clauses because of the limitations periods, *see Gooden*, 2002 WL 31557689, at *5 (declining to consider enforceability of contract's limit on statute of limitations since there was no argument that the plaintiff failed to bring timely claim).

Court can sever the fee-splitting provisions and enforce the rest of the arbitration clauses. Severing the fee-splitting provisions in this manner is authorized by both the language of the contracts and by the law of Minnesota.

Each contract contains a savings clause that provides that any provision of the contract that is contrary to law should be severed or amended and the remainder of the contract enforced. Arradizadeh Decl. Ex. 2 ¶ 26; Schaffler Decl. Ex. 3 ¶ 33. Butler argues that, under *Atcas* and *Onvoy*, an arbitration clause cannot be severed from the rest of the contract. That is true but irrelevant. The question in *Atcas* and *Onvoy* was whether an arbitration clause can be saved by being severed from an otherwise invalid contract. *See Onvoy*, 669 N.W.2d at 353 n.7. The question here is whether an invalid provision within an otherwise valid arbitration clause (which itself is part of an otherwise valid contract) can be severed. *Onvoy*, *Atcas*, and similar cases do not address that question.

Even in the absence of a savings clause, the Court would be authorized under Minnesota law to sever an unconscionable contractual term and enforce the contract "without the offending language." *Kauffman Stewart, Inc.*, 589 N.W.2d at 502. Given that (1) Minnesota has a strong policy favoring arbitration, *see Peggy Rose*, 640 N.W.2d at 606; (2) both agreements contain savings clauses; and (3) Minnesota law authorizes courts to sever unconscionable terms, the Court will sever the fee-splitting provisions

and enforce the remainder of the arbitration clauses.[35]  *See Gooden*, 2002 WL 31557689,

at *5 (severing fee-splitting provision of contract without a savings clause).

Even if the Court did not have authority to sever the fee-splitting provisions,

defendants have cured any unconscionability by agreeing to pay the entire cost of the

arbitration.  Butler argues that such an after-the-fact offer cannot save an arbitration

clause containing a fee-splitting provision from being declared unconscionable.  Some

courts agree with Butler that an after-the-fact offer is insufficient to cure an

unconscionable arbitration clause because unconscionability is determined at the time

of contracting.  *See Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 285 (3d Cir.

---

[35]Butler argues that severing the fee-splitting provision would be an unauthorized use of the blue-pencil doctrine.  Butler cites *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1050 (D. Minn. 2019), but that case declined to blue pencil the prohibited-work clause of a non-compete provision because the party did not request this remedy, the non-compete provision was very broad, there was no clear definition of a key phrase in the agreement, and there was no evidence showing the parties' intent as to the meaning of that provision.  *Id.*  None of those factors are present in this case.  Butler also cites *Bess v. Bothman*, 257 N.W.2d 791, 794 (Minn. 1977), but that case supports the Court's decision to sever the fee-splitting clause, as it states that "[t]he rationale of the blue pencil doctrine is that a court is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties."  By severing the fee-splitting provisions, the Court is giving effect to the rest the agreements, but is not impermissibly drafting new clauses for the parties.

Minnesota law is clear that "[w]here the contract language unambiguously permits severability, as in this case where there is a severability clause, courts will sever the unenforceable provision and enforce the remaining provisions of the contract." *Schmit Towing, Inc. v. Frovik*, No. A12-0989, 2012 WL 6652637, at *5 (Minn. Ct. App. Dec. 24, 2012).  That is exactly what the Court is doing in this case.

2004) (rejecting after-the-fact offer to waive unconscionable provisions in arbitration clause because unconscionability under Virgin Islands law is determined at time of contracting); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 676 (6th Cir. 2003) ("In considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay . . . ."); *Del Rio v. CreditAnswers, LLC*, No. 10cv346-WQH-BLM, 2010 WL 2196587, at *6 n.3 (S.D. Cal. May 27, 2010) (rejecting defendant's offer to pay because it did not cover the rest of the putative class and because unconscionability is determined at the time the contract is made under California law); *Perez v. Hosp. Ventures-Denver LLC*, 245 F. Supp. 2d 1172, 1174 (D. Colo. 2003) (rejecting offer to pay when contract had a fee-splitting clause, no severability clause, and plaintiff refused the offer).

But other courts have found that such after-the-fact offers are effective to cure an unconscionable arbitration clause.  *See Bekele v. Lyft, Inc.*, 918 F.3d 181, 189 (1st Cir. 2019) (applying Massachusetts law to determine fee-splitting provision was not substantively unconscionable after defendant's offer to pay); *Woodmen of World*, 479 F.3d at 567 (offer to pay resolved unconscionability concerns); *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004) (pre-litigation offer to pay resolved substantive unconscionability and *Green Tree* effective-vindication concerns); *Almoudheji v. Autos. of Sw. Hous., LP*, No. 4:19-CV-01425, 2020 WL 1987492, at *4 (S.D. Tex. Apr. 24, 2020) (offer

to pay moots combined *Green Tree* and unconscionability argument); *Curtis v. Contractor*

*Mgmt. Servs., LLC*, No. 1:15-cv-487-NT, 2018 WL 6071999, at *9 (D. Me. Nov. 20, 2018)

(finding defendant's covenant not to enforce cost-splitting provision mooted

unconscionability argument); *Signavong v. Volt Mgmt. Corp.*, No. C07-515JLR, 2007 WL

1813845, at *4 (W.D. Wash. June 21, 2007) (offer to pay mooted substantive

unconscionability argument); *Dillow v. Household Int'l Inc.*, No. 3:03CV00084, 2004 WL

5336055, at *3–4 (W.D. Va. Apr. 26, 2004) (determining offer to pay fees satisfied

unconscionability and *Green Tree* concerns, despite contract's fee-splitting provision).

      This Court finds the Eighth Circuit's analysis in *Plummer*, 941 F.3d at 346, to be

instructive.  Applying District of Columbia law, the Eighth Circuit rejected the

argument that an after-the-fact offer to pay fails to cure unconscionability because

unconscionability is determined at the time of contracting.  The Eighth Circuit reasoned

that the "time-of-the-making rule" is invoked "when one party argues that a contract,

though enforceable when formed, has subsequently become unconscionable due to

changes in circumstances."  *Id.*  The court pointed out that it was dealing "with the

opposite situation here."  *Id.*  Based on this reasoning, the court concluded that the

defendant's "offer has cured any substantive unconscionability that the agreement may

have contained."[36]  *Id.*; *see also Dobbins v. Hawk's Enters.*, 198 F.3d 715, 717 & n.4 (8th Cir.

---

      [36]Butler also argued at the hearing that the offer to pay violated the fee-splitting

(continued...)

1999) (noting if the district court finds on remand that the fee is unreasonable and unconscionable, it should "accept the [defendant's] offer to pay the arbitration fees," which was made at oral argument (footnote omitted)).  This Court finds the Eighth Circuit's reasoning to be persuasive and concludes that, even if this Court could not sever the fee-splitting provisions, the defendants' offer to pay the expense of arbitration would cure any problem with those provisions.

For these reasons, the Court concludes that Butler must arbitrate his claims and that defendants must pay all of the fees, costs, and other expenses of that arbitration.

### 3.  Minn. Stat. § 181.722

Finally, Butler argues that the agreements are void for illegality because they misclassified him as an independent contractor in violation of Minn. Stat. § 181.722, subd. 2.  Because the agreements are void for illegality, says Butler, the arbitration clauses are also void, and the Court cannot compel arbitration.  The Court does not agree.

Section 181.722, subd. 2 provides that "[n]o employer shall require or request any employee to enter into any agreement, or sign any document, that results in misclassification of the employee as an independent contractor or otherwise does not

---

[36](...continued)
provisions of the contracts.  According to Butler, however, those provisions are invalid, and the Court has severed them.

accurately reflect the employment relationship with the employer."  The statute

instructs courts to determine the true nature of the employment relationship using "the

applicable workers' compensation and unemployment insurance program laws and

rules." § 181.722, subd. 3.  The statute also provides a civil remedy, but only to

construction workers.  *See* § 181.722, subd. 4 ("A construction worker, as defined in

section 179.254, who is not an independent contractor and has been injured by a

violation of this section, may bring a civil action for damages against the violator.").

There are several problems with Butler's argument.  To start, Butler's § 181.722

claim must be arbitrated as it falls within the scope of the arbitration clauses.  Butler's

misclassification argument is distinguishable from his fraudulent-inducement and

unconscionability claims.  Those claims were not arbitrable because they were based on

pre-contract conduct, and therefore did not "aris[e] out of or relat[e] to" the ICOA or the

lease.  Arradizadeh Decl. Ex. 2 ¶ 28.

By contrast, Butler's § 181.722 claim challenges the *content* of the contracts.  It is

not a claim that a contract is invalid because of something that happened before the

contract was executed.  Instead, it is a claim that a contract is invalid because of its

*terms*—in this case, because the terms of the contract wrongly identify Butler as an

independent contractor.  Butler's misclassification claim therefore "aris[es] out of or

relat[es] to" the ICOA and is covered by the arbitration clause.  *Id.*  An arbitrator—not

this Court—must decide the misclassification claim.  *See Michael-Curry Cos.*, 449 N.W.2d

at 141 (noting parties can agree to arbitrate anything); *Kilcher v. Dale*, 784 N.W.2d 866,

870 (Minn. Ct. App. 2010) (noting the party seeking to avoid arbitration bears "the

burden of proving that the dispute is not within the scope of the arbitration

agreement"); *Minn. Teamsters Pub. & L. Enf't Emps.' Union, Loc. No. 320 v. County of St.

Louis*, 611 N.W.2d 355, 358 (Minn. Ct. App. 2000) (noting "[d]oubts concerning the scope

of arbitrable issues are resolved in favor of arbitration" under the MRUAA); *cf.

Medtronic, Inc. v. ETEX Corp.*, No. Civ.04-1355ADM/AJB, 2004 WL 950284, at *3

(D. Minn. Apr. 28, 2004) (applying FAA and determining that the plaintiff's claim that

contract was void for violating anti-trust laws was arbitrable because such claims

challenged the content of the contract and not the making of the contract).

Putting that aside, it is far from clear that a violation of § 181.722 would render a

contract void.  Quite often, when a Minnesota statute prohibits a type of contract, it

expressly provides that such a contract is void.[37]  Section § 181.722 does not.  Although

---

[37] *See, e.g.*, Minn. Stat. § 62J.71, subd. 1 ("The following types of agreements and
directives are contrary to state public policy, are prohibited under this section, and are
null and void[.]"); Minn. Stat. § 80E.135, subd. 1 ("No manufacturer . . . shall . . . use any
written instrument, agreement, or waiver, to attempt to nullify or modify any provision
of this chapter . . . .  These instruments, agreements, and waivers are null and void.");
Minn. Stat. § 325F.992, subd. 2(a)–(c) ("A person shall not enter into or attempt to enter
into an agreement with a military beneficiary that assigns the military beneficiary's
military pay or military benefits in violation of [federal law] . . . .  An agreement
prohibited by paragraph (a) or (b) is void . . . .").

the *headnote* of § 181.722, subd. 2 states that "[a]greements to misclassify [are]

prohibited," nowhere does the statute itself provide that such agreements are void.  *Cf.*

*Reiter v. Kiffmeyer*, 721. N.W.2d 908, 911 (Minn. 2006) (per curiam) ("[W]e will not read

into a statute a provision that the legislature has omitted, either purposely or

inadvertently.").  "[H]eadnotes . . . are mere catchwords to indicate the contents of the

section or subdivision and are not part of the statute."  Minn. Stat. § 645.49; *see In re*

*PERA Police & Fire Plan Line of Duty Disability Benefits of Brittain*, 724 N.W.2d 512, 514 n.2

(Minn. 2006) ("The parties and the PERA Board frequently refer to . . . the headnotes for

subdivisions 1 and 3 . . . .  But we will avoid these references because the headnotes are

not a part of the statute and do not determine its meaning."); *State v. Lucas*, 589 N.W.2d

91, 93 n.1 (Minn. 1999) ("In its analysis, the trial court relied in part on the headnotes to

the statutes, although the law is clear that headnotes are mere catch words to indicate

the contents of the section or subdivision and are not part of the statutes.").

Under Minnesota law, "[n]ot every illegal contract must be voided in order to

protect public policy."  *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 725 N.W.2d 90, 92

(Minn. 2006).  Instead, courts undertake a case-by-case analysis "to determine whether

the illegality has so tainted the transaction that enforcing the contract would be contrary

to public policy."  *Id.* at 93.  Butler's brief simply assumes that a contract that

misclassifies an employee as an independent contractor would be void in its entirety.

-64-

Butler may be correct, but his conclusion is not compelled by the language of the statute, and this Court is unaware of any case law supporting his argument.[38]

Butler has yet another problem:  Under Minnesota law, "where a contract is illegal only in part, and the illegal part is severable, the remainder will be enforced." *Hartford Acc. & Indem. Co. v. Dahl*, 278 N.W. 591, 593 (Minn. 1938) (quotations and citation omitted).  As noted, the ICOA contains a savings clause.  Thus, even assuming that provisions of the ICOA unlawfully classify Butler as an independent contractor, those provisions could potentially be severed from the agreement and the remainder of the agreement (including the arbitration clause) enforced.  *See Alpha Real Est. Co. of Rochester v. Delta Dental Plan of Minn.*, 671 N.W.2d 213, 221–22 (Minn. Ct. App. 2003) (severing illegal clause in contract and enforcing the remainder because the contract included a severability clause).

---

[38]The Court notes that case law on § 181.722 is sparse.  The Court found only two cases discussing § 181.722—*Roulo v. Key Lakes, Inc.*, No. A17-067, 2017 WL 3863997, at *5 (Minn. Ct. App. Sept. 5, 2017), and *Schmidt v. DIRECTV, LLC*, No. 14-CV-3000 (JRT/JSM), 2016 WL 519654, at *19–22 (D. Minn. Jan. 22, 2016), *report and recommendation adopted*, 2016 WL 526210 (D. Minn. Feb. 9, 2016).  *Schmidt* held that § 181.722 applies to construction workers; *Roulo* determined that § 181.722 did not apply in an unemployment-benefits proceeding, but did not otherwise interpret the statute.

In any event, these are issues for the arbitrator to address.[39]  For present

purposes, what matters is that § 181.722, subd. 2 does not prevent the Court from

enforcing the arbitration clauses.

### F.  Stay of Proceedings

Having determined that there is a valid agreement to arbitrate and that the

parties' dispute falls within it, the Court will grant the motion to compel arbitration and

stay these proceedings.  *See* Minn. Stat. § 572B.07(f); *City of Rochester*, 896 N.W.2d

at 548–49; *Byars*, 414 F. Supp. 3d at 1095.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Defendants' second motion to compel arbitration [ECF No. 32] is

       GRANTED.

2.    Defendants are ORDERED to pay all fees, costs, and other expenses of the

       arbitration.

3.    This case is STAYED pending resolution of the arbitration.

---

[39]Having determined that the parties must arbitrate Butler's claims, the Court
need not address defendants' argument that § 181.722 applies only to construction
workers.  The Court notes, though, that *Schmidt v. DIRECTV, LLC*, No. 14-CV-3000
(JRT/JSM), 2016 WL 519654, at *19–22 (D. Minn. Jan. 22, 2016), *report and recommendation
adopted*, 2016 WL 526210 (D. Minn. Feb. 9, 2016), provides some support for defendants'
interpretation of the statute.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  April 13, 2021                                    s/Patrick J. Schiltz
                                                         Patrick J. Schiltz
                                                         United States District Judge